STATE OF NORTH CAROLINA v. TIMMY EUVONNE GROOMS

No. 39A99

(Filed 21 December 2000)

**1. Constitutional Law— right to speedy trial—failure to raise at trial—no willful misconduct by State—no significant prejudice**

Defendant was not denied his constitutional right to a speedy trial in a capital prosecution for first-degree murder, even though the length of delay from indictment to trial was three years and 326 days, because: (1) defendant waived appellate review of this issue by failing to properly raise the constitutional issue in the trial court; and (2) even if this issue was preserved, the record does not reveal that the delay resulted from willful misconduct by the State when much of the delay was attributed to defendant's unwillingness to cooperate with his attorneys in preparation for trial, defense counsel never filed any motions asserting defendant's right to a speedy trial, and defendant has failed to show that he suffered significant prejudice as a result of the delay.

**2. Constitutional Law— effective assistance of counsel—failure to assert right to speedy trial**

Defendant was not deprived of his constitutional right to effective assistance of counsel in a capital prosecution for first-degree murder even though defense counsel failed to assert defendant's constitutional right to a speedy trial, because defendant cannot show that he suffered any prejudice when defendant's constitutional right to a speedy trial was not violated.

**3. Appeal and Error— preservation of issues—DNA evidence—pretrial motion to suppress—motion in limine— failure to object at trial—no argument in brief—issue waived**

The trial court did not err in a capital prosecution for first-degree murder by denying defendant's motion to suppress and motion in limine to exclude DNA evidence, because: (1) defendant's pretrial motion to suppress and motion in limine are not sufficient to preserve for appeal the question of the admissibility of the State's DNA evidence; (2) defendant waived appellate review of this issue by failing to object during trial to the admission of

the DNA evidence; and (3) although defendant's assignment of error includes plain error as an alternative, defendant does not specifically argue in his brief that there is plain error.

**4. Constitutional Law— effective assistance of counsel— testing of DNA samples—State's failure to inform defense counsel**

Defendant was not denied effective assistance of counsel in a capital prosecution for first-degree murder even though the State failed to inform defense counsel that the SBI had completed DNA testing which precluded defense counsel from making a timely request to observe the SBI's remaining test procedures, because: (1) defendant failed to show that defense counsel's performance was deficient by basing his claim on the State's failure to inform defense counsel of the SBI's progress in testing the DNA samples; (2) defendant does not contend that the SBI employed incorrect testing procedures or that those procedures were conducted improperly; and (3) there was no reasonable possibility that the outcome of the trial was affected.

**5. Jury— challenge for cause—ability to render fair and impartial verdict**

The trial court did not abuse its discretion in a capital prosecution for first-degree murder by denying defendant's challenge for cause under N.C.G.S. § 15A-1212 of a prospective juror who initially indicated he would vote for the death penalty if the jury found defendant guilty of the charges, because: (1) defendant failed to follow the mandatory statutory procedure under N.C.G.S. § 15A-1214(h) to preserve this issue for appellate review; and (2) even if this issue was preserved, the prospective juror indicated upon further questioning that he could remain a fair and impartial juror, could follow the law concerning the burden of proof and presumption of innocence, and could consider both sentencing options.

**6. Jury— challenge for cause—relationship with victim's family and State's witnesses—participated in pretrial protest of case**

The trial court did not abuse its discretion in a capital prosecution for first-degree murder by denying defendant's challenge for cause under N.C.G.S. § 15A-1212 of a prospective juror who had a relationship with the victim's family and two of the State's witnesses, and who also participated in a pretrial protest of the

delay in bringing this case to trial, because: (1) defendant failed to follow the mandatory statutory procedure under N.C.G.S. § 15A-1214(h) to preserve this issue for appellate review; and (2) even if this issue was preserved, the prospective juror indicated that his knowledge of the victim and her family members would not affect his ability to render a fair and impartial verdict.

**7. Jury— challenge for cause—personal relationship with law enforcement officers**

The trial court did not abuse its discretion in a capital prosecution for first-degree murder by denying defendant's challenge for cause under N.C.G.S. § 15A-1212 of a juror on the basis of his personal relationship with several of the law enforcement officers who were prospective witnesses for the State because the juror indicated he could remain a fair and impartial juror, could base his decision on the evidence presented in the case, and would not give any greater weight to the testimony of these prospective witnesses.

**8. Evidence— murder weapon—knife—testimony—drawing**

The trial court did not abuse its discretion in a capital prosecution for first-degree murder by overruling defendant's objections to testimony and a witness's drawing of a knife that defendant allegedly possessed and possibly used as a murder weapon, because: (1) the witnesses' descriptions of the approximate size of defendant's pocketknife overlap with the medical examiner's testimony regarding the approximate depth and width of the victim's wounds; and (2) the probative value of the evidence substantially outweighed any prejudicial effect.

**9. Evidence— hacksaw frame—hacksaw blades—relevancy—proximity to victim—expert's conclusions**

The trial court did not abuse its discretion in a capital prosecution for first-degree murder by denying defendant's motion to suppress a hacksaw frame and three hacksaw blades, because: (1) the proximity of the hacksaw frame to the location of the victim's severed hand and the expert witness's conclusions that the victim's right hand was severed by a hacksaw blade similar to those seized from the residence of defendant's parents where defendant often resided made the evidence relevant; (2) the lack of evidence that the seized blades could fit into the rusty hacksaw frame and the common availability of hacksaw blades merely affects the weight or probative value of the evidence rather than

its admissibility; and (3) the probative value of the evidence substantially outweighed any prejudicial effect.

## 10. Evidence— blood, hair, and saliva samples—motion to suppress

The trial court did not err in a capital prosecution for first-degree murder by failing to suppress evidence of blood, hair, and saliva samples taken from defendant pursuant to a search warrant authorizing the State to seize blood, hair, and saliva samples, because: (1) probable cause existed to support issuance of the search warrant, including evidence of the victim's severed hand, a hacksaw frame located near the severed hand, hacksaw blades consistent in size with the hacksaw frame seized from the residence of defendant's parents where defendant occasionally resided, a medical examiner opined that the victim's hand was severed by a tool consistent with a hacksaw, witnesses saw defendant outside the victim's home on the night of the murder and later saw him running away from the area where the severed hand and hacksaw were discovered, a medical examiner found semen in the victim's body, there was evidence that the victim had struggled, defendant had numerous scratches and cuts on his body, and defendant had a history of committing sexual offenses; and (2) the State was not required to obtain a nontestimonial identification order or to provide defendant with the right to counsel during the execution of the search warrant.

## 11. Evidence— motion in limine—DNA testing—other individuals

The trial court did not err in a capital prosecution for first-degree murder by allowing the State's motion in limine to preclude defendant from eliciting from the State's expert witness testimony about DNA testing performed on other individuals in this case, because: (1) the DNA testing results excluded the other individuals as perpetrators of the crime; and (2) the evidence would have only highlighted the DNA match between defendant and the sample collected from the victim's body.

## 12. Appeal and Error— preservation of issues—no argument in brief—no objection at trial—issue waived

The trial court did not err in a capital prosecution for first-degree murder by admitting evidence of defendant's past acts of violence against five females, because: (1) defendant's pretrial motion in limine is not sufficient to preserve for appeal the ques-

tion of the admissibility of the State's Rule 404(b) evidence, and defendant waived appellate review of this issue by failing to object during trial to the admission of prior bad acts; and (2) while defendant's assignment of error includes plain error as an alternative, there is no explanation, analysis, or specific contention in his brief to support this assertion.

**13. Criminal Law— competency to stand trial—failure to order independent psychiatric evaluation**

The trial court did not err in a capital prosecution for first-degree murder by failing to order an independent psychiatric evaluation under N.C.G.S. § 15A-1002 when defendant's capacity to proceed was raised by defense counsel at trial, because: (1) defendant points to nothing in the record to indicate that he was incompetent to proceed with trial; and (2) the record showed that defendant stated he did not want a mental health examination, he understood the proceedings and his rights, he assisted in his own defense throughout trial, and he understood the ramifications of his decision not to present mitigating evidence during the sentencing proceeding.

**14. Homicide; Rape; Kidnapping; Robbery— motion to dismiss—sufficiency of evidence**

The trial court did not err by denying defendant's motion to dismiss the charges of first-degree murder, first-degree rape, first-degree kidnapping, and robbery with a dangerous weapon, because evidence was presented that: (1) the victim was last seen alive standing with defendant on a street corner; (2) defendant was nearly hit by a car while running away from the location where police later discovered the victim's severed hand; (3) defendant returned home with a scratched face, with a bleeding cut on his arm, and without the jacket that he frequently wore; (4) defendant gave several inconsistent explanations for the scratches and bleeding cut on his arm; (5) defendant told his girlfriend that he had thrown his coat away, he had buried his other clothes, and the police would never know where the clothes were; (6) defendant's DNA matched the sperm found in the victim's body; (7) the stab wounds on the victim's body were consistent in size and shape with a knife that defendant regularly carried; (8) the victim's right hand had been severed by a hacksaw with a blade designed exactly like the hacksaw blades seized from the residence of defendant's parents where defendant lived from time to time; (9) defendant asked a friend for money to get

out of town; and (10) the victim's body was found in pine straw in the woods, and defendant had on a previous occasion commented to one of the witnesses whom he had assaulted that he could kill her and hide her body under the pine straw in the woods.

**15. Criminal Law— jury instruction—flight**

The trial court did not err in a capital prosecution for first-degree murder by instructing the jury that it could consider evidence of flight in determining defendant's guilt, because the evidence taken in the light most favorable to the State permits an inference that defendant had a consciousness of guilt and took steps, even though unsuccessful, to avoid apprehension.

**16. Criminal Law— prosecutor's argument—defendant as "the prince of darkness" and "the King of Cobra"**

The trial court did not commit prejudicial error in a capital prosecution for first-degree murder by failing to intervene ex mero motu during the prosecutor's closing argument that referred to defendant as "the prince of darkness" and "the King of Cobra," because: (1) the prosecutor never improperly compared defendant to an animal; (2) the prosecutor's references were connected to the evidence which suggested that defendant regularly rode his bicycle around during the night, that defendant drank King Cobra Beer on the night of the victim's disappearance, and that a King Cobra beer bottle was found near the victim's residence after the murder; and (3) the references were not disparaging and did not amount to satanic or demonic references as defendant contends.

**17. Criminal Law— prosecutor's argument—defendant stalked the innocent**

The trial court did not commit prejudicial error in a capital prosecution for first-degree murder by failing to intervene ex mero motu during the prosecutor's closing argument that "defendant stalked the innocent, some of them children," because the statement was connected to evidence that showed defendant had committed acts of sexual violence against three young girls.

STATE v. GROOMS

[353 N.C. 50 (2000)]

**18. Criminal Law— prosecutor's argument—victim's last thoughts**

The trial court did not commit prejudicial error in a capital prosecution for first-degree murder by failing to intervene ex mero motu during the prosecutor's closing argument inquiring about what the victim was thinking as defendant choked, beat, raped, mutilated, and stabbed her, because: (1) the prosecutor did not improperly characterize defendant as satanic or demonic as defendant contends; (2) arguments concerning what a victim may have been thinking as he or she was dying are not grossly improper; (3) the argument was based upon the evidence presented at trial and reasonable inferences which could be drawn therefrom; and (4) the prosecutor did not ask the jurors to put themselves in the position of the victim.

**19. Criminal Law— prosecutor's argument—referring to defense counsel's trial strategy as "ingenuity of counsel"— contention of creating a smoke screen**

The trial court did not commit prejudicial error in a capital prosecution for first-degree murder by failing to intervene ex mero motu during the prosecutor's closing argument repeatedly referring to defense counsel's trial strategy as "ingenuity of counsel" and contending that defense counsel created a smoke screen to take the focus away from defendant, because: (1) the prosecutor did not use abusive, vituperative, or opprobrious language; (2) the prosecutor did not impugn the integrity of defense counsel or repeatedly attempt to diminish defense counsel before the jury, but instead stated that both defense counsel were fine lawyers that he respected and who had done a good job representing defendant; and (3) the prosecutor never expressed a personal opinion regarding defendant's guilt, but merely asked the jury to find facts and draw permissible inferences based upon the competent evidence introduced during trial.

**20. Criminal Law— prosecutor's argument—defendant's pocketknife could have been murder weapon**

The trial court did not commit prejudicial error in a capital prosecution for first-degree murder by failing to intervene ex mero motu during the prosecutor's closing argument that the pocketknife regularly carried by defendant could have been the murder weapon, because: (1) the prosecutor made reasonable inferences from the competent evidence introduced during trial

based on the witnesses' descriptions of the size of defendant's pocketknife; and (2) the witnesses' descriptions overlap with the medical examiner's testimony regarding the size and depth of the stab wounds on the victim's body.

**21. Constitutional Law— capital sentencing—strategy— defendant's wishes**

The trial court did not err in a capital prosecution for first-degree murder by ordering defense counsel to defer to defendant's wishes not to present mitigating evidence, because: (1) the Eighth and Fourteenth Amendments do not require a defendant to acquiesce in a trial strategy to present mitigating evidence where defendant and his counsel reach an absolute impasse; and (2) defendant was fully informed of and understood the potential consequences of his decision.

**22. Constitutional Law— effective assistance of counsel— deferring to defendant's wishes not to present mitigating evidence**

The trial court did not deny defendant his right to effective assistance of counsel in a capital prosecution for first-degree murder by ordering defense counsel to defer to defendant's wishes not to present mitigating evidence, because: (1) defendant concedes in his brief that his counsel's performance was not deficient; and (2) defendant cannot show that the trial court's ruling prejudiced his defense when the trial court did not err in precluding defense counsel from presenting mitigating evidence.

**23. Criminal Law— prosecutor's argument—defendant received sentence of imprisonment for prior crime**

The trial court did not err in a capital prosecution for first-degree murder by failing to intervene ex mero motu during the prosecutor's closing argument urging the jury to recommend the death sentence based on the fact that defendant already received a sentence of imprisonment for his prior acts of violence against other women and he was not deterred, because: (1) the prosecutor never used the word "parole" and never mentioned the possibility that a life sentence for this crime would mean that defendant would eventually be released; (2) the prosecutor merely referred to the fact that defendant committed this crime after serving a prison term for another similar crime, implying that imprisonment had not deterred defendant in the past; and (3) the prosecutor's argument properly focused on the importance of the

jury's duty and suggested that the death penalty would specifically deter defendant from committing future crimes.

**24. Criminal Law— prosecutor's argument—defendant has opportunity to go last and argue as many times as he chooses during closing arguments**

The trial court did not err in a capital prosecution for first-degree murder by failing to intervene ex mero motu during the prosecutor's closing argument that defendant has the opportunity to go last and to argue as many times as he chooses during closing arguments, because: (1) the prosecutor's argument was a proper statement of the law under N.C.G.S. § 15A-2000(a)(4); and (2) the prosecutor was not improperly implying to the jury that defendant did not present any mitigating evidence or make a closing argument based on the fact that defendant did not have any evidence or argument to present since defense counsel did not announce until after the prosecutor's closing argument that defendant refused to present any closing arguments.

**25. Sentencing— capital—death penalty not disproportionate**

The trial court did not err by imposing the death sentence because: (1) defendant was convicted of first-degree murder based upon premeditation and deliberation and under the felony murder rule; (2) the jury found the N.C.G.S. § 15A-2000(e)(3) aggravating circumstance of defendant's prior conviction for a violent felony; (3) the jury found the N.C.G.S. § 15A-2000(e)(5) aggravating circumstance that the murder was committed while defendant was engaged in the commission of first-degree rape; (4) the jury found the N.C.G.S. § 15A-2000(e)(5) aggravating circumstance that the murder was committed while defendant was engaged in the commission of first-degree kidnapping; (5) the jury found the N.C.G.S. § 15A-2000(e)(6) aggravating circumstance that the murder was committed for pecuniary gain; and (6) the jury found the N.C.G.S. § 15A-2000(e)(9) aggravating circumstance that the murder was especially heinous, atrocious, or cruel.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Ellis (B. Craig), J., on 24 April 1998 in Superior Court, Scotland County, upon a jury verdict finding defendant guilty of first-degree murder. On 26 October 1999, the Supreme Court allowed defendant's motion to bypass the Court

of Appeals as to his appeal of additional judgments. Heard in the Supreme Court 11 September 2000.

*Michael F. Easley, Attorney General, by Mary D. Winstead, Assistant Attorney General, for the State.*

*Leslie Ann Laufer for defendant-appellant.*

PARKER, Justice.

Defendant Timmy Euvonne Grooms was indicted on 11 April 1994 for robbery with a dangerous weapon, first-degree kidnapping, and first-degree murder in the kidnapping and killing of victim Krista Kay Godwin. On 31 October 1994 defendant was indicted for first-degree rape. Defendant was tried capitally and found guilty of first-degree murder on the basis of premeditation and deliberation and under the felony murder rule. He was also found guilty of first-degree rape, first-degree kidnapping, and robbery with a dangerous weapon. Following a capital sentencing proceeding, the jury recommended a sentence of death for the murder; and the trial court entered judgment accordingly. The trial court also sentenced defendant to consecutive sentences of forty years' imprisonment for defendant's convictions of robbery with a dangerous weapon and first-degree kidnapping and to life imprisonment for the first-degree rape conviction. For the reasons discussed herein, we conclude that defendant's trial was free from prejudicial error.

The State's evidence tended to show that defendant and Krista Kay Godwin were neighbors in Laurel Hill, North Carolina. On 14 February 1994, Godwin was planning an intimate Valentine's Day dinner with her fiancé, Michael McDaniel. Godwin spent the afternoon with a friend, Myra Martin. Around 6:30 p.m. Godwin spoke on the telephone with her mother and with McDaniel, who called Godwin from work during his 6:30 break. Godwin and Martin then went to Rita Quick's house for approximately thirty or forty-five minutes. While at Quick's house, Godwin ate some dinner and phoned her mother. Godwin and Martin returned to Godwin's home, and Martin left around 7:30 p.m. Godwin called her father between 8:00 p.m. and 9:00 p.m. and told her father that she was waiting for McDaniel to come home from work.

McDaniel attempted to phone Godwin from work around 10:00 p.m. When no one answered his repeated attempts to call Godwin, McDaniel became concerned and left work early. McDaniel arrived at Godwin's home around 10:25 p.m. The front door was unlocked; the

lights were on; the dogs were in the yard; and Godwin's shoes, purse, and jacket were in the house, but Godwin was missing. McDaniel phoned Martin, Godwin's father, and the police. Martin then phoned the police, the hospital, and Quick. Godwin's father helped McDaniel search the neighborhood for Godwin.

Meanwhile, around 6:00 p.m. Chad Miller noticed defendant straddling his bike in some bushes near Godwin's house. Miller called out to defendant, and defendant rode away on his bike without answering. Miller proceeded to downtown Laurel Hill, where he sat on the steps of an abandoned building and drank beer with defendant. Miller walked defendant home, leaving defendant at the house defendant shared with Hope Norton at approximately 9:00 p.m. Around 10:00 or 10:15 p.m. Kenneth Boswell noticed defendant and Godwin standing together on a street corner. At approximately 1:00 a.m. Shirley Johnson nearly hit defendant with her car as he ran down the street from the direction of Mildred's Florist Shop. Johnson told law enforcement officers that defendant was wearing a blue jacket, a dark hat, and light-colored jeans. Defendant then returned home twice for short periods, both times without the blue jacket that he frequently wore and that he had been wearing earlier.

When defendant returned home the next morning, his face was scratched; and he was bleeding from a long cut on his arm. Defendant told Norton that two black men had assaulted him, that his dog had scratched his face, that he had gotten scratched riding his bicycle under a tree, and that he had gotten scratched in some bushes while breaking into a house. Defendant also told Norton that he had thrown away his jacket. Later, defendant told Norton that he had buried the other clothing he had worn that night and that the police would never find this other clothing.

On the morning of 16 February 1994 Marvin Radford, Jr., discovered a severed human hand when he climbed onto the roof of Mildred's Florist Shop to patch some leaks. On that same day a search team looked for Godwin in a nearby wooded area. As he walked through the wooded area, Deputy Thomas Butler discovered a negligee. Deputy Butler continued to search the surrounding area until he saw human toes sticking up from some pine straw. Deputy Butler then recognized the outline of a human body, which was later uncovered and identified as Godwin.

The pathologist who performed the autopsy on Godwin found a total of twelve stab wounds on Godwin's body, all of which were

inflicted by the same instrument, possibly a pocketknife. One stab wound perforated Godwin's aorta and would have caused Godwin's death within minutes; however, several other wounds that penetrated Godwin's chest cavity were potentially fatal. The pathologist found numerous linear scratches and scrapes on Godwin's back and on the back of Godwin's legs that were consistent with the dragging of the body. Additionally, Godwin's face exhibited scrapes and extensive bruising around the eyes and nose resulting from blunt-force trauma inflicted while Godwin was still alive. Internal bleeding and hemorrhaging in the tissues of the neck indicated that Godwin had been choked before she was stabbed. Vaginal smears revealed the presence of intact sperm. Godwin's right hand had been sawed off at the forearm; and Godwin's left hand had been partially sawed off, then the bone had been forcibly broken or snapped. The contents of Godwin's stomach indicated that Godwin had eaten her last meal within four or five hours of her death.

Additional facts will be presented as needed to discuss specific issues.

## PRETRIAL ISSUES

[1] In his first assignment of error, defendant contends that he was denied his constitutional right to a speedy trial under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 18 of the North Carolina Constitution. Defendant also contends that he was deprived of his constitutional right to effective assistance of counsel as a result of defense counsel's failure to assert defendant's right to a speedy trial.

Before trial defense counsel filed various motions seeking to compel discovery from the State; and defendant filed several *pro se* motions, including a petition for writ of habeas corpus. At a pretrial hearing on 26 February 1997, defendant clarified for the trial court that his request for a writ of habaes corpus was based on his inability to prepare for trial without discovery from the State; and defendant mentioned that he had been denied his right to a speedy trial. However, defense counsel never demanded a speedy trial, nor did counsel file a motion to dismiss for failure to provide a speedy trial.

Having elected for representation by appointed defense counsel, defendant cannot also file motions on his own behalf or attempt to represent himself. Defendant has no right to appear both by himself and by counsel. *See* N.C.G.S. § 1-11 (1999); *State v. Parton*, 303 N.C. 55, 61, 277 S.E.2d 410, 415 (1981), *disavowed on other grounds by*

*State v. Freeman*, 314 N.C. 432, 437-38, 333 S.E.2d 743, 746-47 (1985); *State v. Phillip*, 261 N.C. 263, 268, 134 S.E.2d 386, 391, *cert. denied*, 377 U.S. 1003, 12 L. Ed. 2d 1052 (1964). Thus, defendant waived appellate review of this issue by failing to properly raise the constitutional issue in the trial court. *See State v. Barnes*, 345 N.C. 184, 237, 481 S.E.2d 44, 73, *cert. denied*, 522 U.S. 876, 139 L. Ed. 2d 134 (1997), *and cert. denied*, 523 U.S. 1024, 140 L. Ed. 2d 473 (1998).

Assuming *arguendo* that the speedy trial issue was raised in the trial court, defendant's right to a speedy trial was not violated. In *Barker v. Wingo*, 407 U.S. 514, 530, 33 L. Ed. 2d 101, 117 (1972), the United States Supreme Court identified four factors "which courts should assess in determining whether a particular defendant has been deprived of his right" to a speedy trial under the federal Constitution. These factors are: (i) the length of delay, (ii) the reason for the delay, (iii) the defendant's assertion of his right to a speedy trial, and (iv) whether the defendant has suffered prejudice as a result of the delay. *See id.*; *see also State v. Flowers*, 347 N.C. 1, 27, 489 S.E.2d 391, 406 (1997), *cert. denied*, 522 U.S. 1135, 140 L. Ed. 2d 150 (1998). We follow the same analysis when reviewing such claims under Article I, Section 18 of the North Carolina Constitution. *See Flowers*, 347 N.C. at 27, 489 S.E.2d at 406; *State v. Jones*, 310 N.C. 716, 721, 314 S.E.2d 529, 532-33 (1984).

First, the length of the delay is not *per se* determinative of whether the defendant has been deprived of his right to a speedy trial. *See State v. Webster*, 337 N.C. 674, 678, 447 S.E.2d 349, 351 (1994). The United States Supreme Court has found postaccusation delay "presumptively prejudicial" as it approaches one year. *Doggett v. United States*, 505 U.S. 647, 652 n.1, 120 L. Ed. 2d 520, 528 n.1 (1992). However, presumptive prejudice "does not necessarily indicate a statistical probability of prejudice; it simply marks the point at which courts deem the delay unreasonable enough to trigger the *Barker* enquiry." *Id.* In this case the length of delay, from indictment to trial, was 3 years and 326 days. This delay is clearly enough to trigger examination of the other factors.

Second, defendant has the burden of showing that the delay was caused by the neglect or willfulness of the prosecution. *See Webster*, 337 N.C. at 679, 447 S.E.2d at 351. Here, defendant contends that the State willfully refused to comply with discovery despite representations to the trial court that it would proceed with discovery in a timely manner. However, the record does not reveal that the delay resulted from willful misconduct by the State. To the contrary, the

record shows numerous causes for the delay, including the appointment of substitute defense counsel in June of 1994 and changes in the prosecutors who were handling the case. Additionally, although defense counsel filed numerous discovery requests and motions contending that the State refused to proceed with discovery in a timely manner, the record indicates that defendant repeatedly requested discovery of evidence or information to which he was not statutorily entitled; and the State expeditiously complied with discovery orders issued by the trial court. Finally and most significantly, in 1996, nearly two years after indictment, defense counsel filed a motion to withdraw as a result of defendant's continued refusal to cooperate in the preparation of his defense. Thus, much of the delay was attributable to defendant's unwillingness to cooperate with his attorneys in preparation for trial. "A criminal defendant who has caused or acquiesced in a delay will not be permitted to use it as a vehicle in which to escape justice." *State v. Tindall,* 294 N.C. 689, 695-96, 242 S.E.2d 806, 810 (1978).

Third, as stated above, defense counsel never filed any motions asserting defendant's right to a speedy trial. On 26 February 1997, nearly three years after his indictment, defendant himself mentioned the right to a speedy trial in the context of discussing with the trial court his request for a writ of habeas corpus. Defendant's failure to assert his right to a speedy trial, or his failure to assert his right sooner in the process, does not foreclose his speedy trial claim, but does weigh against his contention that he has been denied his constitutional right to a speedy trial. *See Webster,* 337 N.C. at 680, 447 S.E.2d at 352.

Fourth, in considering whether the defendant has been prejudiced because of a delay between indictment and trial, this Court noted that a speedy trial serves " '(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired.' " *Id.* at 681, 447 S.E.2d at 352 (quoting *Barker,* 407 U.S. at 532, 33 L. Ed. 2d at 118).

Defendant has failed to show that he suffered significant prejudice as a result of the delay. Defendant contends that two material witnesses, Shirley Johnson and Tony Mauldin, became unavailable by reason of the delay. Defendant contends that he was unable to confront these witnesses, whose hearsay statements were introduced at trial by the State. However, defendant rebutted the State's hearsay statement from Johnson by introducing a hearsay statement that

Johnson made to defendant's investigator; and although defense counsel indicated that defendant would similarly rebut the State's hearsay statement from Mauldin, defendant never actually attempted to introduce any hearsay statements from Mauldin.

Defendant also contends that he was prejudiced by "prolonged and oppressive pretrial incarceration." Defendant argues that he suffered anxiety and concern as the result of the delay. Defendant cites his outbursts during trial and his refusal to allow mitigating evidence at the capital sentencing proceeding as evidence of his anxiety and concern. However, nothing in the record supports defendant's contention that his disruptive behavior resulted from his prolonged incarceration; but the timing of these outbursts permits the inference that defendant's actions were calculated to intimidate State's witnesses as they testified on *voir dire*. Likewise, defendant's refusal to present mitigating evidence during the capital sentencing proceeding did not stem from incarceration, as the record indicates that defendant refused to cooperate with his attorneys from the outset.

After balancing the four factors set forth above, we hold that defendant's constitutional right to a speedy trial has not been violated.

[2] Defendant also contends that he was deprived of his constitutional right to effective assistance of counsel as a result of defense counsel's failure to assert defendant's constitutional right to a speedy trial. A defendant's right to counsel includes the right to effective assistance of counsel. *See McMann v. Richardson*, 397 U.S. 759, 771 n.14, 25 L. Ed. 2d 763, 773 n.14 (1970). When a defendant attacks his conviction on the basis that counsel was ineffective, he must show that his counsel's conduct fell below an objective standard of reasonableness. *See Strickland v. Washington*, 466 U.S. 668, 687-88, 80 L. Ed. 2d 674, 693 (1984). In order to meet this burden, defendant must satisfy a two-part test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687, 80 L. Ed. 2d at 693.

In this case, defendant cannot satisfy this two-part test. Even assuming *arguendo* that defense counsel erred by failing to assert defendant's right to a speedy trial, defendant cannot show that he suffered any prejudice. Defendant argues that defense counsel's deficient performance deprived him of the dismissal to which he was entitled. However, as explained above, defendant's constitutional right to a speedy trial was not violated; and defendant was not entitled to a dismissal of the charges against him. Thus, after examining the record we conclude that there is no reasonable probability that the alleged error of defense counsel affected the outcome of the trial. *See State v. Braswell*, 312 N.C. 553, 563, 324 S.E.2d 241, 249 (1985). This assignment of error is overruled.

**[3]** Defendant next contends that the trial court erred by denying defendant's motion to suppress the DNA evidence and motion *in limine* to exclude the DNA evidence. Defendant argues that any probative value of the State's DNA evidence was substantially outweighed by unfair prejudice. Defendant also contends that he was deprived of his right to effective assistance of counsel as a result of defense counsel's failure to ensure the reliability of the State's DNA testing results through observation of the State's testing procedures. We disagree.

In this case the trial court, at a pretrial hearing, denied defendant's motion to suppress DNA evidence and motion *in limine*. During trial the State called State Bureau of Investigation ("SBI") Special Agent Mark Boodee to testify as an expert witness. Defendant objected three times during Special Agent Boodee's testimony. The trial court overruled defendant's objection to the State's question concerning the percentage of cases in which Special Agent Boodee declared a match and to the State's question about the percentage of the population excluded by the DNA tests performed in this case. The trial court sustained defendant's objection to and allowed defendant's motion to strike Special Agent Boodee's testimony that his boss and another analyst reviewed his test results. However, defendant never objected to the admissibility of the State's DNA evidence or to Special Agent Boodee's testimony regarding the probability of selecting someone other than defendant with the same DNA profile as the sample obtained from the victim's body.

We have previously stated that a motion *in limine* is not sufficient to preserve for appeal the question of admissibility of evidence if the defendant does not object to that evidence at the time it is offered at trial. *See State v. Hayes*, 350 N.C. 79, 80, 511 S.E.2d 302,

303 (1999) (per curiam). We have also held that a pretrial motion to suppress, a type of motion *in limine*, is not sufficient to preserve for appeal the issue of admissibility of evidence. *See State v. Golphin*, 352 N.C. 364, 405, 533 S.E.2d 168, 198 (2000). Thus, defendant's pretrial motion to suppress and motion *in limine* are not sufficient to preserve for appeal the question of the admissibility of the State's DNA evidence; and defendant waived appellate review of this issue by failing to object during trial to the admission of the DNA evidence. Additionally, while defendant's assignment of error includes plain error as an alternative, he does not specifically argue in his brief that there is plain error in the instant case. Accordingly, defendant's argument is not properly before this Court. *See* N.C. R. App. P. 10(c)(4); *Golphin*, 352 N.C. at 405, 533 S.E.2d at 198-99; *State v. McNeil*, 350 N.C. 657, 681, 518 S.E.2d 486, 501 (1999), *cert. denied*, —— U.S. ——, 146 L. Ed. 2d 321 (2000).

[4] Defendant further contends that he was denied the effective assistance of counsel due to the State's bad faith conduct, as a result of which defense counsel failed to ensure the reliability of the State's DNA testing results by requesting an opportunity to observe the State's procedures. We disagree.

The SBI began testing the DNA samples from this case on 7 March 1994 and completed the testing procedures on 22 August 1994. The entire male DNA sample collected from the victim's body was consumed during the extraction process done by the SBI on 7 March 1994. At a 15 April 1994 pretrial hearing, the trial court entered a verbal order that the DNA samples for this case should be preserved by the SBI pending trial to provide defendant with an opportunity for independent testing. The trial court declined to order disclosure of the SBI's DNA testing and preservation methods. Instead, the trial court instructed the State to confer with the SBI about the possibility that the SBI could discuss and mutually agree upon proper testing and preservation methods with defendant's expert witness. However, the trial court did not order, and defense counsel did not request, that the SBI provide defendant with the opportunity to have a defense expert observe the SBI's testing procedures. At a hearing on 8 September 1994 the State informed defense counsel and the trial court that the entire male DNA sample collected from the victim's body was consumed in the SBI's testing procedure.

Defendant asserts that the State's failure to inform defense counsel that the male DNA sample had been consumed until 8 September 1994, after the SBI had completed the DNA testing, rendered defense

counsel ineffective in that defense counsel was precluded from making a timely request to observe the SBI's remaining testing procedures. As we explained above, to establish a claim for ineffective assistance of counsel, defendant must show "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693.

In this case, defendant cannot satisfy this two-part test. First, defendant has failed to show that defense counsel's performance was deficient, instead basing his claim on the State's failure to apprise defense counsel of the SBI's progress in testing the DNA samples. Further, although defendant challenges the conclusions reached by Special Agent Boodee, defendant does not contend that the SBI employed incorrect testing procedures or that those procedures were conducted improperly. Therefore, after examining the record, we conclude that there is no reasonable probability that the outcome of the trial was affected by the State's failure to apprise defense counsel of the SBI's progress or by defense counsel's failure to request an opportunity to observe the SBI's testing procedures. *See Braswell*, 312 N.C. at 563, 324 S.E.2d at 249. This assignment of error is overruled.

By assignments of error, defendant contends that the trial court erred in denying his challenges for cause of prospective jurors John Chavis and Spencer Jones and juror Donald Dean on the basis of their inability to render a fair and impartial verdict. We disagree.

During jury selection the trial court denied defendant's challenges for cause as to jurors Chavis and Jones, and defendant used a peremptory challenge to remove juror Chavis. Defendant used his final peremptory challenge to remove juror Jones. Defendant then made a general renewal of his objections to the trial court's rulings excusing jurors. The trial court denied defendant's renewed objections and his request for an additional peremptory challenge. As defendant had exhausted his peremptory challenges, the trial court subsequently seated juror Dean after denying defendant's challenge for cause. Defendant then renewed "each of the challenges" for cause, and defendant specifically renewed his earlier challenge for cause to juror Jones. The trial court again denied defendant's renewed objections and his request for an additional peremptory challenge.

N.C.G.S. § 15A-1212 sets forth the grounds for challenging a juror, including the ground that the juror, for any other cause, is unable to render a fair and impartial verdict. N.C.G.S. § 15A-1212(9) (1999).

N.C.G.S. § 15A-1214 provides that a defendant may seek reversal of the trial judge's refusal to allow a challenge for cause provided the defendant has exhausted his peremptory challenges, has renewed his challenge, and has had his renewal motion denied. N.C.G.S. § 15A-1214(h) (1999).

In this case, defendant complied with the requirements of N.C.G.S. § 15A-1214(h) by specifically renewing his challenge for cause as to juror Jones. However, defendant failed to specifically renew his motions for cause as to jurors Dean and Chavis. Instead, defendant made a general renewal of his prior challenges for cause; and defendant's requests for additional peremptory challenges do not bolster his general renewal of his challenges for cause. *See State v. Roseboro*, 351 N.C. 536, 544, 528 S.E.2d 1, 7 (2000) (holding that the defendant's request for an additional peremptory challenge was insufficient to renew his earlier challenge for cause). Thus, defendant failed to follow the mandatory statutory procedure to preserve for appellate review his exception to the rulings on his challenges for cause of jurors Dean and Chavis.

Assuming *arguendo* that defendant's general renewal of his challenges for cause preserved for appellate review the trial court's rulings as to jurors Dean and Chavis, we find defendant's assignments of error without merit. The determination of whether to grant a challenge for cause rests in the sound discretion of the trial court and will not be disturbed absent a showing of abuse of that discretion. *See State v. Trull*, 349 N.C. 428, 441-42, 509 S.E.2d 178, 188 (1998), *cert. denied*, —— U.S. ——, 145 L. Ed. 2d 80 (1999); *State v. Hartman*, 344 N.C. 445, 458, 476 S.E.2d 328, 335 (1996), *cert. denied*, 520 U.S. 1201, 137 L. Ed. 2d 708 (1997). In addition to abuse of discretion, defendant must show prejudice to establish reversible error concerning *voir dire. See Trull*, 349 N.C. at 442, 509 S.E.2d at 188.

[5] First, defendant maintains that the trial court should have excused prospective juror John Chavis on the basis that Chavis would vote for the death penalty if the jury found defendant guilty of the charges. Chavis gave unequivocal responses to the prosecutor's questions about his ability to consider both the death penalty and life imprisonment. However, defendant then engaged Chavis in a lengthy dialog about whether Chavis believed that the death penalty would be the only appropriate punishment if defendant was convicted of all the charges. Chavis' answers varied between a willingness to consider life imprisonment and the belief that the death penalty was the only appropriate punishment in this case. Chavis ultimately agreed that

his ability to consider life imprisonment upon a conviction of first-degree murder would be substantially impaired by the answers that he had given. Defendant then challenged Chavis for cause, and the trial court permitted the prosecutor and defendant to ask Chavis some additional questions. In response to the follow-up questions, Chavis explained that he had been confused by defendant's earlier questions; and Chavis unequivocally indicated that he could remain a fair and impartial juror, could follow the law concerning the burden of proof and presumption of innocence, and could consider both sentencing options. On this record defendant has failed to demonstrate an abuse of the trial court's discretion in denying the challenge for cause as to prospective juror Chavis.

[6] Second, defendant argues that the trial court erred in failing to remove prospective juror Spencer Jones for cause based on: (i) his relationship with the victim, the victim's father, and the victim's uncles; (ii) his relationship with State witnesses Kevin Blades and Kevin Wallace; and (iii) his participation in a pretrial protest of the delay in bringing this case to trial. The transcript reveals that Jones knew who the victim was but that they were not friends. Additionally, Jones knew the victim's family through his father, who was a friend of the victim's father and uncles. Jones had no intention of getting involved in the protest of this case, but he ended up at the protest because he was spending the day with his father. Jones unequivocally stated that his knowledge of the victim and her family members would not affect his ability to render a fair and impartial verdict and that he had no opinion about defendant's guilt or innocence. Further, Jones explained that he had been a friend of State witnesses Kevin Blades and Kevin Wallace in the past; that he considered them to be honest people; and that he would tend to believe their testimony. However, Jones also explained that he could fairly and impartially assess the credibility of a stranger's testimony. Thus, Jones' responses do not demonstrate that he could not return a verdict in accordance with the law of North Carolina. The trial court heard prospective juror Jones' responses, observed his demeanor, assessed his credibility, and in its discretion, made the decision to reject defendant's for-cause challenge. Again, on this record, defendant has failed to show an abuse of discretion.

[7] Finally, defendant contends that the trial court erred in denying his challenge for cause to juror Donald Dean on the basis of his personal relationship with several of the law enforcement officers who were prospective witnesses for the State. Dean was a friend of Scotland County Sheriff Wayne Bryant and was acquainted with sev-

eral other law enforcement officers, mainly through athletic events. However, Sheriff Bryant did not testify as a witness in this case; and Dean's unequivocal responses indicated that he could remain a fair and impartial juror, could base his decision only on the evidence presented in this case, and would not give any greater weight to the testimony of these prospective witnesses. Thus, defendant has failed to demonstrate that the trial court abused its discretion in denying the challenge for cause as to juror Dean. These assignments of error are overruled.

## GUILT-INNOCENCE PHASE

[8] By assignments of error, defendant contends that the trial court committed reversible error in overruling his objections to testimony about and to a drawing of a knife that defendant allegedly possessed. Defendant also contends that the trial court committed reversible error in denying his motion to suppress a hacksaw frame and three hacksaw blades. Defendant argues that, because the State failed to associate the knife, the hacksaw frame, or the hacksaw blades with the commission of the offense, the items bore absolutely no relevance to whether defendant committed the offense and should have been excluded. We disagree.

This Court has previously explained the applicable standard of relevance concerning the admissibility of a possible murder weapon:

Under our rules of evidence, unless otherwise provided, all relevant evidence is admissible. N.C.G.S. § 8C-1, Rule 402 (1988). " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1988). In criminal cases, " '[e]very circumstance that is calculated to throw any light upon the supposed crime is admissible. The weight of such evidence is for the jury.' " *State v. Whiteside*, 325 N.C. 389, 397, 383 S.E.2d 911, 915 (1989) (quoting *State v. Hamilton*, 264 N.C. 277, 286-87, 141 S.E.2d 506, 513 (1965), *cert. denied*, 384 U.S. 1020, 16 L. Ed. 2d 1044 (1966)).

*State v. Felton*, 330 N.C. 619, 638, 412 S.E.2d 344, 356 (1992), *quoted in State v. DeCastro*, 342 N.C. 667, 680-81, 467 S.E.2d 653, 659, *cert. denied*, 519 U.S. 896, 136 L. Ed. 2d 170 (1996). In *DeCastro*, this Court held that the trial court properly admitted into evidence a knife found three months after the murder in a pond some distance away from the crime scene. *See DeCastro*, 342 N.C. at 682, 467 S.E.2d at 659.

Although the knife had no bloodstains and was not tested for finger-prints, the medical examiner opined "that some of the fatal knife wounds found on both victims were consistent with the length and width of the knife and that the knife could have been one of the murder weapons." *Id.* at 681, 467 S.E.2d at 660. We noted that the lapse in time in finding the knife and the distance of the knife from the crime scene affected the weight or probative value of the evidence, not its admissibility. *Id.* at 682, 467 S.E.2d at 660; *see also Felton,* 330 N.C. at 638, 412 S.E.2d at 356 (failure of State's expert to match conclusively four bullets to the gun that fired the fatal bullet affected the weight, not the admissibility, of the evidence).

In this case, State witness Chad Miller described a pocketknife that defendant frequently carried with him. Miller described defendant's knife as having a blade approximately three and one-half inches in length. Miller also identified a drawing that he had made of defendant's pocketknife. State witnesses Hope Norton and Scotland County Deputy Sheriff Randy Jacobs subsequently testified that defendant possessed a pocketknife, and both witnesses indicated that defendant's knife was similar to the pocketknife drawn by Miller. Additionally, Deputy Jacobs testified that the blade of defendant's knife was approximately one-half inch to one inch wide and three to four inches long. Finally, the medical examiner who conducted the victim's autopsy testified that the stab wounds found on the victim's body measured approximately .3 to .5 inches wide and were, at most, four to five inches deep. The medical examiner concluded that the stab wounds would be consistent with a pocketknife if the pocketknife was the approximate size and shape of the wounds.

Because the witnesses' descriptions of the approximate size of defendant's pocketknife overlap with the medical examiner's testimony regarding the approximate depth and width of the victim's wounds, we conclude that the trial court did not err in overruling defendant's objections to the drawing of and testimony about the knife. Defendant's argument concerning the slight variance in size between the knife described by the witnesses and the medical examiner's description of the victim's wounds merely affects the weight or probative value of the evidence, not its admissibility.

[9] Similarly, defendant's argument that the hacksaw frame and hacksaw blades were not relevant in this case is without merit. At the hearing on the motion to suppress, Detective Paul Lemmond of the Scotland County Sheriff's Department testified that he found an old

STATE v. GROOMS

[353 N.C. 50 (2000)]

adjustable hacksaw frame lying on the ground near the location where the victim's severed hand had been discovered. Detective Lemmond also recovered a package of three hacksaw blades from a storage building at the residence of defendant's parents. Detective Lemmond never measured the hacksaw frame or tried to insert the seized hacksaw blades into the recovered frame; instead, Detective Lemmond submitted the hacksaw frame and blades to the SBI for testing. Former SBI Special Agent Mark Gavin, an expert in forensic tool-mark examination, subsequently examined the seized hacksaw frame and hacksaw blades. Although Special Agent Gavin did not find any fingerprints, blood, or bone fragments on the hacksaw blades seized by Detective Lemmond, he concluded that the victim's right hand was severed by a saw with relatively small teeth, consistent with those found on the seized hacksaw blades.

Based on the proximity of the hacksaw frame to the location of the victim's severed hand and the expert witness' conclusions that the victim's right hand was severed by a hacksaw blade similar to those seized from the residence of defendant's parents, we conclude that the trial court did not err in denying defendant's motion to suppress the hacksaw frame and three hacksaw blades. Defendant's arguments regarding the lack of fingerprints on the hacksaw frame, the lack of evidence that the seized blades could be fitted into the rusty hacksaw frame, and the common availability of hacksaw blades merely affect the weight or probative value of the evidence, not its admissibility.

Defendant also argues that the prejudicial effect of this evidence substantially outweighed its probative impact and that the trial court should have excluded it under N.C.G.S. § 8C-1, Rule 403. The decision to exclude relevant evidence under Rule 403 lies within the trial court's discretion. See Felton, 330 N.C. at 638, 412 S.E.2d at 356. As noted above, three State witnesses described a pocketknife owned by defendant that was consistent with the width and depth of the stab wounds found on the victim's body; and this pocketknife circumstantially connects defendant to the murder. Further, the hacksaw frame was discovered near the victim's severed hand; and the expert witness concluded that the victim's hand was severed with a hacksaw blade similar to the seized blades. Thus, we cannot conclude that there was unfair prejudice to defendant substantially outweighing the probative value of this evidence, such that the trial court abused its discretion in allowing its admission. These assignments of error are overruled.

**[10]** By his next assignment of error, defendant contends that the trial court erred in failing to suppress blood, hair, and saliva samples taken from him pursuant to a search warrant authorizing the State to seize blood, hair, and saliva samples. Defendant argues that the State should have seized this evidence pursuant to a nontestimonial identification order obtained under article 14 of chapter 15A of the General Statutes and that the State should have accorded him the right to counsel as provided by those statutes. Defendant further contends that he was denied the effective assistance of counsel as a result of defense counsel's failure to object to the procedures by which the State obtained DNA samples from defendant. We disagree.

The Fourth Amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth Amendment is applicable to the states through the Due Process Clause of the Fourteenth Amendment. *See State v. Watkins*, 337 N.C. 437, 441, 446 S.E.2d 67, 69 (1994). Similarly, the Constitution of the State of North Carolina provides that "[g]eneral warrants, whereby any officer or other person may be commanded to search suspected places without evidence of the act committed, or to seize any person or persons not named, whose offense is not particularly described and supported by evidence, are dangerous to liberty and shall not be granted." N.C. Const. art. I, § 20.

The invasion of a person's body to seize blood, saliva, and hair samples is the most intrusive type of search; and a warrant authorizing the seizure of such evidence must be based upon probable cause to believe the blood, hair, and saliva samples constitute evidence of an offense or the identity of a person who participated in the crime. *See* N.C.G.S. § 15A-242(4) (1999); *State v. Dickens*, 346 N.C. 26, 37, 484 S.E.2d 553, 558-59 (1997). In contrast, a nontestimonial identification order authorized by article 14 of chapter 15A of the General Statutes of North Carolina is an investigative tool requiring a lower standard of suspicion that is available for the limited purpose of identifying the perpetrator of a crime. *See State v. Welch*, 316 N.C. 578, 584, 342 S.E.2d 789, 792 (1986). Under N.C.G.S. § 15A-273 a judge may issue a nontestimonial identification order on an affidavit which establishes (i) that there is probable cause to believe that a felony offense or a class A1 or class 1 misdemeanor has been committed, (ii) that there are reasonable grounds to suspect that the person named or described in the affidavit committed the offense, and (iii) that the

results will be of material aid in determining whether that particular person committed the offense. Additionally, although the constitutional right to counsel does not apply to Fourth Amendment searches and seizures, *see, e.g., State v. Warren*, 348 N.C. 80, 95-97, 499 S.E.2d 431, 439-40 (explaining that an alleged defendant has the right to counsel under the Fifth Amendment during custodial interrogation and that the Sixth Amendment right to counsel attaches once adversary judicial proceedings have been initiated), *cert. denied*, 525 U.S. 915, 142 L. Ed. 2d 216 (1998), the General Assembly created a statutory right to the presence of counsel during any nontestimonial identification procedure for persons subject to a nontestimonial identification order, *see* N.C.G.S. § 15A-279(d) (1999).

In this case the trial court issued a search warrant on 22 February 1994 authorizing the State to seize blood, hair, and saliva samples from defendant. The affidavit signed by Detective Lemmond contained ample evidence to support issuance of the warrant, *inter alia*: (i) that the victim's severed hand was discovered on the roof of a store; (ii) that Detective Lemmond located a hacksaw frame near the location of the severed hand; (iii) that hacksaw blades consistent in size with the hacksaw frame were seized from the residence of defendant's parents, where defendant occasionally resides; (iv) that, in the medical examiner's opinion, the victim's right hand was severed by a tool consistent with a hacksaw; (v) that witnesses had seen defendant outside the victim's home on the night of her murder and, later, running away from the area where the severed hand and hacksaw were discovered; (vi) that the medical examiner found semen in the victim's vagina; (vii) that evidence at the crime scene suggested that the victim had struggled; (viii) that defendant had numerous scratches and cuts on his legs, face, and neck; and (ix) that defendant had a history of committing sexual offenses. The cumulative effect of this information establishes that the blood, hair, and saliva samples seized from defendant provide evidence of the offense and the identity of the person participating in the crime. Accordingly, probable cause existed to support issuance of the search warrant; and the State was not required to obtain a nontestimonial identification order or to provide defendant with the right to counsel during the execution of the search warrant.

Furthermore, defendant's claim for ineffective assistance of counsel must fail. Defendant cannot show "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693. The State

STATE v. GROOMS

[353 N.C. 50 (2000)]

properly obtained a search warrant, and defendant was not entitled to the presence of counsel during the execution of that warrant. Thus, there is no possibility that the outcome of the trial would have been affected if defense counsel had objected to the State's procedures. *See Braswell*, 312 N.C. at 563, 324 S.E.2d at 249. This assignment of error is overruled.

[11] Next, defendant assigns error to the trial court's ruling allowing the State's motion *in limine* to preclude defendant from eliciting from the State's expert witness testimony about DNA testing performed on other individuals. Defendant argues that the DNA testing of other individuals was clearly relevant to a crucial issue in the case, namely, whether defendant, not some other person, was in fact the perpetrator of the crime. Defendant also contends that the excluded evidence casts doubt upon this fundamental aspect of the State's case in that continued testing of other suspects reflected a weakness in the State's evidence that defendant was the perpetrator. Thus, considering that the State's case against defendant, other than DNA evidence, was based entirely on circumstantial evidence, the trial court's error in allowing the State's motion *in limine* was prejudicial error entitling defendant to a new trial. We disagree.

In this case defendant made a motion *in limine* seeking to exclude the results of DNA testing performed on Tony Mauldin; Chad Miller; Kevin Morgan; and the victim's fiancé, Michael McDaniel. The trial court allowed the motion as to Mauldin, Miller, and Morgan on the basis that the evidence was not relevant. Defendant then withdrew the motion against the advice of defense counsel. Prior to cross-examination of the State's expert witness, the State made a motion *in limine* to exclude the DNA testing results for Mauldin, Miller, and Morgan on the bases that the evidence was not relevant and that the probative value of the evidence was substantially outweighed by its prejudicial value. The trial court allowed the State's motion.

Under Rule 401 evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1999). Relevant evidence is generally admissible, and in criminal cases "any evidence calculated to throw any light upon the crime charged" should be admitted by the trial court. *See State v. Huffstetler*, 312 N.C. 92, 104, 322 S.E.2d 110, 118 (1984), *cert. denied*, 471 U.S. 1009, 85 L. Ed. 2d 169 (1985).

Even assuming *arguendo* that the evidence in question was relevant, defendant cannot show that he suffered any prejudice as a result of the trial court's ruling. The DNA testing results excluded Mauldin, Miller, and Morgan as perpetrators of the crime. Given this circumstance, the evidence would have only highlighted the DNA match between defendant and the sample collected from the victim's body. Accordingly, defendant cannot demonstrate a reasonable possibility that, absent the trial court's ruling, a different result would have been reached at the trial. *See* N.C.G.S. § 15A-1443(c) (1999). This assignment of error is overruled.

[12] In his next assignment of error, defendant contends that the trial court erred in admitting evidence of past acts of violence against Judy Caulder, Elizabeth Johnson, Amber Smith, Rose Smith, and Hope Norton. Defendant argues that the evidence was inadmissible under N.C.G.S. § 8C-1, Rule 404(b) and that its probative value, if any, was substantially outweighed by the danger of unfair prejudice to defendant under N.C.G.S. § 8C-1, Rule 403. The crux of defendant's argument is that acts of violence committed against these witnesses have nothing to do with the murder of the victim.

In this case defendant filed a motion *in limine* to exclude evidence of past acts of violence against Caulder, Johnson, Amber Smith, Rose Smith, and Norton. The trial court, after hearing *voir dire* testimony from each of the witnesses, denied defendant's motion, concluding that the prior acts were sufficiently similar to this case and not too remote in time so as to be admissible under N.C.G.S. § 8C-1, Rule 404(b). The State then elicited testimony on direct examination from each of the women about past acts of violence committed by defendant. Defendant never objected to the admissibility of the State's Rule 404(b) evidence or to the witnesses' testimony regarding the acts of domestic violence and sexual violence committed against them by defendant.

As stated earlier, a motion *in limine* is not sufficient to preserve for appeal the question of admissibility of evidence if the defendant does not object to that evidence at the time it is offered at trial. *See Hayes*, 350 N.C. at 80, 511 S.E.2d at 303. Thus, defendant's pretrial motion *in limine* is not sufficient to preserve for appeal the question of the admissibility of the State's Rule 404(b) evidence; and defendant waived appellate review of this issue by failing to object during trial to the admission of the evidence of prior bad acts. Additionally, while defendant's assignment of error includes plain error as an alternative, he "provides no explanation, analysis or

specific contention in his brief supporting the bare assertion that the claimed error is so fundamental that justice could not have been done." *State v. Cummings*, 352 N.C. 600, 636, 536 S.E.2d 36, 61 (2000). Accordingly, defendant's argument is not properly before this Court. *See* N.C. R. App. P. 10(c)(4); *Cummings*, 352 N.C. at 637, 536 S.E.2d at 61; *Golphin*, 352 N.C. at 405, 533 S.E.2d at 198-99; *McNeil*, 350 N.C. at 681, 518 S.E.2d at 501. This assignment of error is overruled.

[13] Next, defendant contends that the trial court erred in failing to order an independent psychiatric evaluation pursuant to N.C.G.S. § 15A-1002 when defendant's capacity to proceed was raised by defense counsel at trial. We disagree.

The transcript reveals that defense counsel twice raised the issue of defendant's capacity to proceed with trial. Defense counsel cited defendant's refusal to present mitigating evidence during the capital sentencing proceeding as evidence of defendant's incapacity. At an *ex parte* hearing on 15 April 1998, defendant explained that he did not need a psychiatric evaluation and that he had refused to cooperate with defense counsel in preparing mitigation evidence for the sentencing proceeding because he was innocent of these charges and, if found guilty, would rather be dead than spend the rest of his life in prison. Defendant also explained his frequent outbursts at trial as his spontaneous reactions when witnesses lied during their testimony. The trial court then ruled that defendant had been fully advised by counsel, that defendant understood his rights, and that defendant had made a conscious decision not to have an independent psychiatric evaluation. At the beginning of the capital sentencing proceeding, defense counsel again filed an *ex parte* motion for an independent competency evaluation. The trial court concluded that defendant understood the nature of the proceedings and that defendant had assisted in and directed his own defense throughout the trial. Further, the trial court noted that defendant refused to cooperate with an independent evaluation; and the trial court denied defense counsel's motion for an independent evaluation.

N.C.G.S. § 15A-1001 provides, in pertinent part, as follows:

(a) No person may be tried, convicted, sentenced, or punished for a crime when by reason of mental illness or defect he is unable to understand the nature and object of the proceedings against him, to comprehend his own situation in reference to the

proceedings, or to assist in his defense in a rational or reasonable manner.

N.C.G.S. § 15A-1001(a) (1999). A trial court may order a mental health evaluation of a defendant when that defendant's capacity to proceed is questioned. *See* N.C.G.S. § 15A-1002(b)(1) (1999). The trial court has the power on its own motion to order such an evaluation as part of an inquiry into the defendant's capacity to proceed. *See State v. Rich*, 346 N.C. 50, 60-61, 484 S.E.2d 394, 401, *cert. denied*, 522 U.S. 1002, 139 L. Ed. 2d 412 (1997). Where a defendant demonstrates or where matters before the trial court indicate that there is a significant possibility that a defendant is incompetent to proceed with trial, the trial court must appoint an expert or experts to inquire into the defendant's mental health in accord with N.C.G.S. § 15A-1002(b)(1). *See id.* at 61, 484 S.E.2d at 401.

Defendant points to nothing in the record in the present case, however, tending to indicate that he was incompetent to proceed with trial. Our review of the record discloses that defendant was adamant and unequivocal about not wanting a mental-health examination; that defendant fully understood the proceedings and his rights; that defendant assisted in his own defense throughout trial by directing the filing of motions, the questioning of witnesses, and the presentation of evidence; that defendant fully understood the ramifications of his decision not to present mitigating evidence during the sentencing proceeding; and that defendant's outbursts during trial occurred during the *voir dire* of the five Rule 404(b) witnesses, suggesting defendant's deliberate intent to intimidate these witnesses. In the absence of any evidence suggesting that defendant may have been incompetent, we conclude that the trial court did not err in deciding not to order the evaluation. This assignment of error is, therefore, overruled.

[14] Defendant next contends that the trial court erred by denying his motion to dismiss the charges of first-degree murder, first-degree rape, first-degree kidnapping, and robbery with a dangerous weapon. Defendant does not argue that these crimes did not occur; instead, defendant argues that the State's evidence was not sufficient to prove that he was the perpetrator of these crimes. We disagree.

In ruling on a motion to dismiss, the trial court must consider the evidence in the light most favorable to the State and give the State every reasonable inference to be drawn therefrom. *See State v. Lee*, 348 N.C. 474, 488, 501 S.E.2d 334, 343 (1998). The State must present

substantial evidence of each element of the offense charged. *See id.* "[T]he trial court should consider all evidence actually admitted, whether competent or not, that is favorable to the State." *State v. Jones*, 342 N.C. 523, 540, 467 S.E.2d 12, 23 (1996). "If there is substantial evidence—whether direct, circumstantial, or both—to support a finding that the offense charged has been committed and that the defendant committed it, the case is for the jury and the motion to dismiss should be denied," *State v. Locklear*, 322 N.C. 349, 358, 368 S.E.2d 377, 383 (1988); however, if the evidence "is sufficient only to raise a suspicion or conjecture as to either the commission of the offense or the identity of the defendant as the perpetrator, the motion to dismiss must be allowed," *State v. Malloy*, 309 N.C. 176, 179, 305 S.E.2d 718, 720 (1983).

In this case the evidence, viewed in the light most favorable to the State, shows that on the evening of the victim's disappearance, defendant stood near the victim's home at a place where he could look into her window. The victim was last seen alive around 10:00 p.m. on 14 February 1994 standing with defendant on a street corner. Around 1:00 a.m. defendant was nearly hit by a car while running away from the location where police later discovered the victim's severed hand. Defendant returned home the next morning with a scratched face, with a bleeding cut on his arm, and without the jacket that he frequently wore. Defendant then gave several inconsistent explanations for the scratches and bleeding cut on his arm. Defendant further told his girlfriend that he had thrown his coat away; that he had buried his other clothes which he had taken from his girlfriend's house; and that the police would never know where the clothes were. The State's evidence further showed that defendant's DNA matched the sperm found inside the victim's vagina; that the stab wounds on the victim's body were consistent in size and shape with a knife that defendant regularly carried; and that the victim's right hand had been severed by a hacksaw with a blade designed exactly like the hacksaw blades seized from the residence of defendant's parents where defendant lived from time to time. Finally, about one month after the murder, defendant appeared at a friend's house wanting to sell the friend a VCR for twenty dollars. Although defendant did not have the VCR with him, the friend gave defendant twenty dollars. Later that evening defendant called the same friend at work and asked for money so that he could "get out of town." Further, defendant had on a previous occasion commented to one of the witnesses whom he had assaulted that he could kill her and hide her body under the pine straw in the woods, and it would

kill the odor of the body or cause the body to deteriorate. We hold that this evidence is sufficient to permit a rational jury to find that defendant was the perpetrator. This assignment of error is overruled.

**[15]** Defendant next assigns error to the trial court's action in instructing the jury that it could consider evidence of flight in determining defendant's guilt. The trial court instructed the jury as follows:

> The [S]tate contends that the defendant talked to Johnny Bailey about assisting him in leaving town. Evidence of flight may be considered by you, together with all the other facts and circumstances in this case, in determining whether the combined circumstances amount to an admission or show of consciousness of guilt. However, proof of this circumstance is not sufficient in itself to establish the defendant's guilt. Further, this circumstance has no bearing on the question of whether the defendant acted with premeditation and deliberation. Therefore it must not be considered by you as evidence of premeditation or deliberation.

A flight instruction is proper where " 'some evidence in the record reasonably support[s] the theory that defendant fled after commission of the crime charged.' " *State v. Levan*, 326 N.C. 155, 164-65, 388 S.E.2d 429, 434 (1990) (quoting *State v. Irick*, 291 N.C. 480, 494, 231 S.E.2d 833, 842 (1977)). The relevant inquiry is whether the evidence shows that defendant left the scene of the crime and took steps to avoid apprehension. *Id.* at 165, 388 S.E.2d at 429.

In this case the evidence tended to show that defendant, after killing the victim, hid the body in pine straw in the woods, left the scene of the crime, and returned to the home that he shared with his girlfriend, Hope Norton. Additionally, several weeks after the killing, defendant called Johnny Bailey at work and asked Bailey to bring twenty dollars to him at the bus stop. According to Bailey, defendant sounded "a little panicked." Defendant told Bailey "that they were after him" and "that he had to get out of town." Bailey refused to meet defendant at the bus stop or to give defendant any money; instead, Bailey left work and informed a law enforcement officer about his conversation with defendant. These facts, taken in the light most favorable to the State, permit an inference that defendant had a consciousness of guilt and took steps, albeit unsuccessful, to avoid apprehension. Thus, the trial court's jury instruction on flight was jus-

tified. *See State v. Reeves*, 343 N.C. 111, 113, 468 S.E.2d 53, 55 (1996) (holding that the trial court properly instructed the jury on flight where the defendant ran from the crime scene, got into a car waiting nearby, and drove away). Furthermore, the trial court's instruction correctly informed the jury that proof of flight was not sufficient by itself to establish guilt and would not be considered as tending to show premeditation and deliberation. *See State v. Brewton*, 342 N.C. 875, 879, 467 S.E.2d 395, 398 (1996). This assignment of error is overruled.

**[16]** In his next assignment of error, defendant contends that the trial court committed prejudicial constitutional error in failing to intervene *ex mero motu* at several points during the prosecution's closing argument. We disagree.

Where a defendant fails to object to the closing arguments at trial, defendant must establish that the remarks were so grossly improper that the trial court abused its discretion by failing to intervene *ex mero motu*. "To establish such an abuse, defendant must show that the prosecutor's comments so infected the trial with unfairness that they rendered the conviction fundamentally unfair." *See State v. Davis*, 349 N.C. 1, 23, 506 S.E.2d 455, 467 (1998), *cert. denied*, 526 U.S. 1161, 144 L. Ed. 2d 219 (1999).

In this case the prosecutor first argued to the jury that defendant "stalk[ed] the innocent, some of them children"; and the prosecutor twice referred to defendant as "the prince of darkness" and "the King of Cobra." Defendant argues that these characterizations constitute abusive and impermissible references to defendant in that the prosecutor demonized defendant and created a metaphor in which defendant was Satan.

This Court has stated that it is improper to compare "criminal defendants to members of the animal kingdom." *State v. Richardson*, 342 N.C. 772, 793, 467 S.E.2d 685, 697, *cert. denied*, 519 U.S. 890, 136 L. Ed. 2d 160 (1996). However, in this instance the prosecutor never compared defendant to an animal. Instead, the prosecutor's references to defendant as "the prince of darkness" and "the King of Cobra" were connected to the evidence which suggested that defendant regularly rode his bicycle around Laurel Hill during the night; that defendant drank King Cobra beer on the night of the victim's disappearance; and that a King Cobra beer bottle was found near the victim's residence after the murder. In context the use of the phrases "the prince of darkness" and "the King of Cobra" to describe

defendant was not disparaging and did not amount to satanic or demonic references. *See State v. Braxton*, 352 N.C. 158, 203, 531 S.E.2d 428, 455 (2000) (holding that the prosecutor's description of the defendant as "cowardly" did not warrant intervention by the trial court *ex mero motu* where the evidence showed that the defendant killed a physically smaller and weaker man).

[17] Likewise, the prosecutor's comment that defendant "stalk[ed] the innocent, some of them children," was connected to the evidence which showed that defendant had committed acts of sexual violence against three young girls. The State's evidence tended to show that defendant raped Judy Caulder when she was eleven years old, Amber Smith when she was sixteen or seventeen years old, and Elizabeth Johnson when she was twelve or thirteen years old. Thus, in context, the prosecutor's reference to defendant as a stalker of innocent children was not a disparaging remark requiring intervention by the trial court *ex mero motu*.

[18] The prosecutor also made a lengthy argument to the jury in which the prosecutor inquired about what the victim was thinking as defendant choked, beat, raped, mutilated, and stabbed her. The prosecutor concluded this argument as follows:

> What was she thinking then? Did she feel the life itself just trickle out of her? We don't know. What was she thinking? No doubt, if her eyes could even possibly be open at that point, no doubt there in the pine forest in the domain of this man right here, all those pine needles, when she looked up, no doubt those black pine boughs looked like the black gulf into hell and she was riding in there.

Defendant asserts that the prosecutor's argument improperly bolstered the allusion to defendant as demonic or satanic.

As stated above, the prosecutor did not improperly characterize defendant as satanic or demonic. Further, we have previously reviewed closing arguments that suggested what a victim may have been thinking as he or she was dying and concluded that they were not grossly improper. *See State v. Jones*, 346 N.C. 704, 714, 487 S.E.2d 714, 720 (1997); *State v. Hunt*, 339 N.C. 622, 652, 457 S.E.2d 276, 294 (1994); *State v. King*, 299 N.C. 707, 711-13, 264 S.E.2d 40, 43-44 (1980). Here, the prosecutor described what the victim may have been thinking and the pain that she was experiencing as defendant choked, beat, raped, mutilated, and stabbed her to death. This argu-

ment was based upon the evidence presented at trial and reasonable inferences which could be drawn therefrom. By making this argument the prosecutor did not ask the jurors to put themselves in the position of the victim. Accordingly, we conclude that the trial court did not err by failing to intervene *ex mero motu*.

[19] Further, the prosecutor repeatedly referred to defense counsel's trial strategy as "ingenuity of counsel." The prosecutor also argued to the jury as follows:

> I want you to think about and consider what is the role of these two lawyers right over here, Lawyer Diehl and Lawyer Horne? And they are fine lawyers. I've got a great deal of respect for both of them. They're fine lawyers and I'm not talking about them personally, but what is a defense counsel's role in this case? . . . Their job, and they've done a good job of it, is to take issue with everything that happens in this courtroom, everything. . . . Their job, and rightly so and they have done it well, is to take the focus away from this man right here. They'll talk about everything and anything other than whether or not [defendant] committed these horrible crimes. . . . Their job is, and they have done it well, is to create as much smoke and fog . . . as possible.

Defendant contends that the prosecutor improperly impugned the good faith and credibility of defense counsel and that the prosecutor impermissibly interjected into the jury argument his personal views and opinions of the defense.

"[A] trial attorney may not make uncomplimentary comments about opposing counsel, and should 'refrain from abusive, vituperative, and opprobrious language, or from indulging in invectives.' " *State v. Sanderson*, 336 N.C. 1, 10, 442 S.E.2d 33, 39 (1994) (quoting *State v. Miller*, 271 N.C. 646, 659, 157 S.E.2d 335, 346 (1967)). In this case, the prosecutor did not use abusive, vituperative, or opprobrious language; nor did the prosecutor impugn the integrity of defense counsel or repeatedly attempt to diminish defense counsel before the jury. Instead, the prosecutor emphasized that both defense counsel were "fine lawyers," that he respected defense counsel, and that defense counsel had done a good job in representing defendant. The prosecutor never expressed a personal opinion regarding the guilt of defendant, but merely asked the jury to find facts and draw permissible inferences based upon the competent evidence introduced during trial. After reviewing the prosecutor's argument in context, we conclude that the prosecutor's statements were not so grossly

improper as to require the trial court to intervene *ex mero motu*. *See State v. White*, 349 N.C. 535, 558, 508 S.E.2d 253, 268 (1998) (holding that the trial court did not err by failing to intervene *ex mero motu* where the prosecutor argued that it was defense counsel's job to defend the defendant regardless of the truth and that the lawyers were "honorable men"), *cert. denied*, 527 U.S. 1026, 144 L. Ed. 2d 779 (1999); *State v. Larrimore*, 340 N.C. 119, 160, 456 S.E.2d 789, 811 (1995) (finding no gross impropriety in the prosecutor's argument that defense counsel created a smoke screen); *State v. Harris*, 338 N.C. 211, 230, 449 S.E.2d 462, 472 (1994) (finding no gross impropriety in the prosecutor's reference to the defense strategy as "ingenuity of counsel").

**[20]** Finally, the prosecutor argued to the jury that the pocketknife regularly carried by defendant could have been the murder weapon. Defendant contends that this argument was based on incompetent evidence in that the dimensions of the knife are not consistent with the wounds on the victim's body. However, as we explained earlier, the witnesses' descriptions of the size of defendant's pocketknife overlap with the medical examiner's testimony regarding the size and depth of the stab wounds on the victim's body. Thus, the prosecutor made a reasonable inference based upon the competent evidence introduced during trial; and the trial court did not err by failing to intervene *ex mero motu*. This assignment of error is overruled.

## SENTENCING PROCEEDING

**[21]** Defendant next contends that the trial court erred in ordering defense counsel to defer to defendant's wishes not to present mitigating evidence. Defendant also contends that the trial court by its order deprived defendant of his constitutional right to effective assistance of counsel. We disagree.

In this case defense counsel twice requested that the trial court order an independent psychiatric evaluation of defendant based on defendant's continued refusal to cooperate with defense counsel in preparing mitigation evidence for the sentencing proceeding. The trial court discussed defense counsel's position with defendant, and defendant reiterated that he understood his rights and the consequences of his decision; but defendant still adamantly refused to present mitigating evidence at the sentencing proceeding. The trial court subsequently denied defense counsel's motions for an independent evaluation and ordered defense counsel to comply with defendant's directive not to present mitigating evidence.

STATE v. GROOMS

[353 N.C. 50 (2000)]

The United States Supreme Court has held that the Eighth and Fourteenth Amendments to the United States Constitution mandate that a jury in a capital case must "not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio,* 438 U.S. 586, 604, 57 L. Ed. 2d 973, 990 (1978). However, the Eighth and Fourteenth Amendments do not require a defendant to acquiesce in a trial strategy to present mitigating evidence where the defendant and his counsel reach an absolute impasse. *Compare White,* 349 N.C. at 567, 508 S.E.2d at 273 (holding that the defendant was not required to present certain evidence in mitigation where the defendant and defense counsel had reached an absolute impasse as to the mitigating value of the evidence), *with State v. Wilkinson,* 344 N.C. 198, 212, 474 S.E.2d 375, 382 (1996) (holding that the trial court properly required defense counsel to present mitigating evidence where the defendant had expressed his desire to simplify the sentencing proceeding but had not reached an absolute impasse with defense counsel over the presentation of any mitigating evidence).

In general, the responsibility for tactical decisions, such as the type of defense to present, "rests ultimately with defense counsel." *State v. McDowell,* 329 N.C. 363, 384, 407 S.E.2d 200, 211 (1991). However, "when counsel and a fully informed criminal defendant client reach an absolute impasse as to such tactical decisions, the client's wishes must control; this rule is in accord with the principal-agent nature of the attorney-client relationship." *State v. Ali,* 329 N.C. 394, 404, 407 S.E.2d 183, 189 (1991). Further, when such impasses arise, defense counsel should make a record of the circumstances, the advice given to the defendant, the reasons for the advice, the defendant's decision, and the conclusion reached. *See id.*

After reviewing the transcript in this case of the discussions among the trial court, defendant, and defense counsel, we conclude that the trial court properly found that defendant and his counsel had reached an absolute impasse over the tactical decision of whether to present mitigating evidence during the capital sentencing proceeding. Defense counsel made a proper record of the circumstances, including their advice to defendant and the reasons for their decision to present mitigating evidence. From these statements of defense counsel and defendant's answers to questions directed to him by the trial court, we conclude that defendant was fully informed of and

understood the potential consequences of his decision. Thus, we hold that the trial court did not err in prohibiting defense counsel from presenting evidence in mitigation.

[22] Defendant further argues that he was deprived of the effective assistance of counsel as a result of the trial court's ruling prohibiting defense counsel from presenting evidence in mitigation. To establish a claim for ineffective assistance of counsel, defendant must show "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693. Here, defendant cannot satisfy this two-part test. First, defendant concedes in his brief that defense counsel's performance was not deficient, instead basing his claim on the trial court's ruling. Second, as we have concluded that the trial court did not err in precluding defense counsel from presenting mitigating evidence, defendant cannot show that the trial court's ruling prejudiced his defense by rendering trial counsel's assistance ineffective. This assignment of error is, therefore, overruled.

In his next assignment of error, defendant contends that the trial court erred by failing to intervene *ex mero motu* when the prosecutor made grossly improper closing arguments. We disagree. Defendant did not object to these arguments at trial. When a defendant fails to object to an allegedly improper closing argument, the standard of review is whether the argument was so grossly improper that the trial court erred in failing to intervene *ex mero motu*. See *Trull*, 349 N.C. at 451, 509 S.E.2d at 193. In a capital trial, the prosecutor is given wide latitude during jury arguments, *see State v. Warren*, 348 N.C. 80, 124, 499 S.E.2d 431, 456, *cert. denied*, 525 U.S. 915, 142 L. Ed. 2d 216 (1998), and has a duty to vigorously present arguments for the sentence of death using every legitimate method, *see State v. Daniels*, 337 N.C. 243, 277, 446 S.E.2d 298, 319 (1994), *cert. denied*, 513 U.S. 1135, 130 L. Ed. 2d 895 (1995).

[23] Defendant first argues that the prosecutor made improper references to the possibility of parole and that the prosecutor urged the jury to recommend the death sentence as punishment for defendant's prior acts of violence against Amber Smith, Rose Smith, and Hope Norton. The prosecutor referred to defendant's prior conviction for attempted first-degree rape, then argued to the jury, in pertinent part, as follows:

> Lo and behold, same man, [defendant], who has sat before you all this time, in 1980, pled guilty to the offense of attempted first

degree rape. It went on to give the judgment in that case. He should be imprisoned for a term of not less than 15 years and not more than 20 years in the custody of the Department of Corrections. That is disturbing information when you're trying to decide the fate of the man who sits over behind me. What does that mean when you think about it in terms of what your recommendation should be in this case? Justice, or at least a judgment produced in the year 1980, and what did it turn out to be? That's temporary justice for this defendant. Temporary justice is what that is. Temporary justice, Ladies and Gentlemen, will no longer suffice. Temporary justice will not be justice for this. You have seen and you have heard about in 1991, you have heard about the events concerning Amber Smith. You've heard from Rose Smith and you heard from Hope Norton, and then you heard about Valentine's Day of 1994. You heard all about [the victim] in this courtroom. Temporary justice. Temporary justice is what led to this. Hasn't [defendant] done enough? . . . No doubt he would like to look ahead. However long that road may be, he would like to look ahead to another time and another place where he can roam and he can lurk and he can prey upon the innocent. There's no doubt. But let me tell you, it's up to you 12 people right here and now in Scotland County to see that such a thing does not happen again.

Defendant contends that, in this argument, the prosecutor improperly implied that defendant was released on parole before serving the entire prison term for his conviction of attempted first-degree rape.

This Court has consistently held that the possibility of parole is not a proper consideration in a capital sentencing proceeding. *See, e.g., Warren,* 348 N.C. at 122, 499 S.E.2d at 455; *State v. Conaway,* 339 N.C. 487, 520, 453 S.E.2d 824, 845, *cert. denied,* 516 U.S. 884, 133 L. Ed. 2d 153 (1995). However, we have considered and rejected arguments similar to that made by defendant in this case. *See State v. Larry,* 345 N.C. 497, 527-28, 481 S.E.2d 907, 925, *cert. denied,* 522 U.S. 917, 139 L. Ed. 2d 234 (1997). Here, as in *Larry,* the prosecutor never used the word "parole" and never mentioned the possibility that a life sentence for this crime could mean that defendant would eventually be released. Instead, the prosecutor referred to the fact that defendant committed this crime after serving a prison term for another similar crime, implying that imprisonment had not deterred defendant in the past. Thus, when read in context, the prosecutor's argument

focused on the importance of the jury's duty and suggested that the death penalty would specifically deter defendant from committing future crimes, both permissible lines of argument by the prosecutor. *See id.* at 527, 481 S.E.2d at 925 (holding that the prosecutor's argument about the defendant's prior convictions and terms of imprisonment properly suggested that only the death sentence would deter defendant from committing future crimes); *see also State v. Williams*, 350 N.C. 1, 28, 510 S.E.2d 626, 644 (specific deterrence arguments are proper), *cert. denied*, —— U.S. ——, 145 L. Ed. 2d 162 (1999); *State v. Jones*, 336 N.C. 229, 256, 443 S.E.2d 48, 61 (argument emphasizing the responsibility and duty of each juror and of the jury as a whole was not improper), *cert. denied*, 513 U.S. 1003, 130 L. Ed. 2d 423 (1994).

**[24]** Defendant also contends that the prosecutor improperly argued to the jury that, in making closing arguments, defendant "ha[s] the opportunity to go last[;] he has the opportunity to argue as often or, through his counsel, he has the opportunity to argue as many times as he chooses." Defendant contends that, in the context of this capital sentencing proceeding, the prosecutor improperly implied to the jury that defendant did not present mitigating evidence or make a closing argument because he did not have any evidence or argument to present. However, the prosecutor's argument was a proper statement of the law pursuant to N.C.G.S. § 15A-2000(a)(4), which provides that the defendant or defense counsel shall have the right to the last argument. Further, defense counsel did not announce until after the prosecutor's closing argument that defendant refused to present any closing arguments. Thus, at the time of the prosecutor's closing argument, the trial court could not have definitively known that defendant would not present a closing argument; and the trial court did not err by failing to intervene *ex mero motu* during the prosecutor's proper closing argument. *See Daniels*, 337 N.C. at 278, 446 S.E.2d at 320 (holding that the trial court did not err by failing to intervene *ex mero motu* where the prosecutor's closing argument was a correct statement of the law). This assignment of error is overruled.

## PRESERVATION ISSUES

Defendant raises nine additional issues that have previously been decided contrary to his position by this Court: (i) whether the trial court erred by conducting with defense counsel and the prosecution numerous unrecorded bench conferences outside defendant's presence but while defendant was present in the courtroom; (ii) whether

the trial court erred when it refused to include defendant's requested instruction regarding parole eligibility in its final charge to the jury; (iii) whether the trial court's capital sentencing jury instructions requiring defendant to prove mitigating circumstances to the "satisfaction" of each juror adequately guided the jury's discretion about the requisite degree of proof; (iv) whether the aggravating circumstance that the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9) (1999), is unconstitutionally vague and overbroad; (v) whether the trial court erred in instructing the jury that it had a "duty" to impose the death penalty if the jury failed to find that the mitigating circumstances outweighed the aggravating circumstances; (vi) whether the trial court's definition of mitigating circumstances unconstitutionally limited the mitigating evidence that the jury could consider; (vii) whether the trial court erred by allowing the jury to refuse to give effect to mitigating evidence if the jury deemed the evidence not to have mitigating value; (viii) whether the trial court erred by instructing the jury that defendant has the burden of proving the existence of mitigating circumstances; (ix) whether the death penalty statute is unconstitutionally vague and overbroad.

Defendant raises these issues for purposes of urging this Court to reexamine its prior holdings and also for the purpose of preserving the issues for any possible further judicial review. We have considered defendant's arguments on these issues and find no compelling reason to depart from our prior holdings. These assignments of error are overruled.

## PROPORTIONALITY

[25] Defendant argues that the sentence of death in this case was imposed under the influence of passion, prejudice, or other arbitrary considerations and that, based on the totality of the circumstances, the death penalty is disproportionate. We are required by N.C.G.S. § 15A-2000(d)(2) to review the record and determine (i) whether the record supports the jury's findings of the aggravating circumstances upon which the court based its death sentence; (ii) whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (iii) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. *See State v. McCollum*, 334 N.C. 208, 239, 433 S.E.2d 144, 161 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994).

After a thorough review of the transcript, record on appeal, briefs, and oral arguments of counsel, we are convinced that the jury's findings of the five aggravating circumstances submitted were supported by the evidence. We also conclude that nothing in the record suggests that defendant's death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor.

Finally, we must consider whether the imposition of the death penalty in defendant's case is proportionate to other cases in which the death penalty has been affirmed, considering both the crime and the defendant. *See State v. Robinson,* 336 N.C. 78, 133, 443 S.E.2d 306, 334 (1994), *cert. denied,* 513 U.S. 1089, 130 L. Ed. 2d 650 (1995). The purpose of proportionality review is "to eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden,* 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied,* 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). Proportionality review also acts "[a]s a check against the capricious or random imposition of the death penalty." *State v. Barfield,* 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied,* 448 U.S. 907, 65 L. Ed. 2d 1137 (1980). Our consideration is limited to those cases which are roughly similar as to the crime and the defendant, but we are not bound to cite every case used for comparison. *See State v. Syriani,* 333 N.C. 350, 400-01, 428 S.E.2d 118, 146, *cert. denied,* 510 U.S. 948, 126 L. Ed. 2d 341 (1993). Whether the death penalty is disproportionate "ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *State v. Green,* 336 N.C. 142, 198, 443 S.E.2d 14, 47, *cert. denied,* 513 U.S. 1046, 130 L. Ed. 2d 547 (1994).

Defendant was convicted of first-degree murder based upon premeditation and deliberation and under the felony murder rule. Defendant was also convicted of first-degree rape, first-degree kidnapping, and robbery with a dangerous weapon. The jury found the five aggravating circumstances submitted: (i) that defendant had been previously convicted of a felony involving the use or threat of violence to another person, N.C.G.S. § 15A-2000(e)(3); (ii) that the murder was committed while defendant was engaged in the commission of first-degree rape, N.C.G.S. § 15A-2000(e)(5); (iii) that the murder was committed while defendant was engaged in the commission of first-degree kidnapping, N.C.G.S. § 15A-2000(e)(5); (iv) that the murder was committed for pecuniary gain, N.C.G.S. § 15A-2000(e)(6); and (v) that the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9).

One statutory mitigating circumstance was submitted for the jury's consideration: the catchall mitigating circumstance that there existed any circumstance arising from the evidence which the jury deemed to have mitigating value, N.C.G.S. § 15A-2000(f)(9). The jury did not find this statutory mitigating circumstance to exist. The trial court did not submit any nonstatutory mitigating circumstances.

We begin our analysis by comparing this case to those cases in which this Court has determined the sentence of death to be disproportionate. This Court has determined the death sentence to be disproportionate on seven occasions. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997), *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983). We conclude that this case is not substantially similar to any case in which this Court has found the death penalty disproportionate.

Several characteristics in this case support the determination that the imposition of the death penalty was not disproportionate. First, defendant was convicted of premeditated and deliberate murder. We have noted that "[t]he finding of premeditation and deliberation indicates a more cold-blooded and calculated crime." *State v. Artis*, 325 N.C. 278, 341, 384 S.E.2d 470, 506 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990). Further, "[i]n none of the cases in which the death penalty was found to be disproportionate has the jury found the (e)(3) aggravating circumstance." *State v. Peterson*, 350 N.C. 518, 538, 516 S.E.2d 131, 143 (1999), *cert. denied*, —— U.S. ——, 145 L. Ed. 2d 1087 (2000). "The jury's finding of the prior conviction of a violent felony aggravating circumstance is significant in finding a death sentence proportionate." *State v. Lyons*, 343 N.C. 1, 27, 468 S.E.2d 204, 217, *cert. denied*, 519 U.S. 894, 136 L. Ed. 2d 167 (1996). Here, the jury found the (e)(3) · aggravating circumstance based on defendant's previous conviction of the violent felony of attempted first-degree rape.

We also consider cases in which this Court has found the death penalty to be proportionate; however, "we will not undertake to discuss or cite all of those cases each time we carry out that duty." *McCollum*, 334 N.C. at 244, 433 S.E.2d at 164. We specifically note

that this Court deemed the death penalty proportionate in a case involving comparable facts. *See Trull*, 349 N.C. at 459, 509 S.E.2d at 198. In *Trull*, the defendant kidnapped, raped, and stabbed the victim to death, then abandoned the victim's body in a wooded area; and the jury subsequently found the (e)(3), (e)(5), and (e)(9) aggravating circumstances in recommending the death sentence. *See id.* at 457-58, 509 S.E.2d at 197. Similarly, in this case, defendant kidnapped, raped, choked, beat, mutilated, and stabbed the victim to death, then abandoned the victim's body in a wooded area; and the jury subsequently found the (e)(3), (e)(5), (e)(6), and (e)(9) aggravating circumstances in recommending the death sentence.

Finally, this Court has deemed four statutory aggravating circumstances, standing alone, to be sufficient to sustain death sentences; the (e)(3), (e)(5), and (e)(9) circumstances are among them. *See State v. Bacon*, 337 N.C. 66, 110 n.8, 446 S.E.2d 542, 566 n.8 (1994), *cert. denied*, 513 U.S. 1159, 130 L. Ed. 2d 1083 (1995). Therefore, we conclude that the present case is more similar to certain cases in which we have found the sentence of death proportionate than to those in which we have found the sentence disproportionate or to those in which juries have consistently returned recommendations of life imprisonment.

We conclude that defendant received a fair trial and capital sentencing proceeding, free from prejudicial error, and that the death sentence in this case is not disproportionate. Accordingly, the judgments of the trial court are left undisturbed.

NO ERROR.