STATE OF NORTH CAROLINA,
v.
JERRY WAYNE EDGEWORTH.
No. COA09-523.
Court of Appeals of North Carolina.
Filed May 4, 2010.
Attorney General Roy A. Cooper, III, by Assistant Attorney General Daniel P. O'Brien, for the State.
Duncan B. McCormick, for defendant-appellant.

UNPUBLISHED OPINION
JACKSON, Judge.
Jerry Wayne Edgeworth ("defendant") appeals the 23 May 2008 judgment entered upon a jury's verdict finding him guilty of the murder of Risden Allen Lyon ("Lyon"). In his appeal, defendant argues that the trial court committed plain error by admitting evidence pursuant to North Carolina Rules of Evidence, Rules 404(b) and 403. For the reasons set forth below, we hold no prejudicial error.
In early 1991, defendant purchased a radio station from Lyon, which he proceeded to operate. Still owing Lyon a significant amount of money from this transaction, on 31 December 1991, defendant visited Lyon at Lyon's office and forced him at gunpoint to sign documents stating that defendant's debt to Lyon had been paid in full. Defendant then forced Lyon into Lyon's truck, shot him in the head, and staged the scene as a suicide.
In August 1995, investigators closed the four-year investigation surrounding Lyon's murder. However, in December 2003  twelve years after Lyon's death  investigators received information about a letter written by defendant's friend, Ronnie Burr ("Burr"), from Burr's girlfriend, Deborah Hopkins ("Hopkins"). Burr, who had been with defendant on the night of 31 December 1991, had provided a detailed account of that evening's events in his letter, including his explanation that he had written the letter because he had begun to fear for his safety and that he had been forced against his will to assist in the cover-up of defendant's crimes.
Hopkins testified that Burr wrote the letter in January of 1992 and then mailed it to himself. Afterwards, he instructed Hopkins to place the letter in her safety deposit box and turn it over to the police should anything happen to him. When Hopkins showed investigators the letter on 6 January 2004, it had not been touched since the day Hopkins began leasing the box on 24 January 1992. After discovering the letter, investigators re-opened their investigation into Lyon's death.
On or about 8 January 2004, investigators arrested Burr, and Burr subsequently gave investigators a comprehensive statement concerning the details surrounding Lyon's murder. This statement, along with the 21 January 1992 letter that Burr wrote and mailed to himself, were both read into evidence. Burr also testified at defendant's trial.
In Burr's letter, police statement, and trial court testimony, he explained that he had known defendant for more than fifty years. On 31 December 1991, defendant phoned Burr, hoping they could spend New Year's Eve together. Already having made plans, Burr declined, and defendant said he would call him later. Later that evening, between 6:30 and 7:00 p.m., defendant called Burr and requested that Burr pick him up in Rockingham, North Carolina. When Burr found defendant, Burr stated that defendant was nervous and instructed Burr to take roads away from the area. Burr also said that, during their car ride, defendant made statements such as "[i]t was a sloppy job. I mean sloppy" and that he "left him with his foot on the brakes."
Defendant then explained to Burr that he needed a big favor from him that "went way beyond friendship." He told Burr to tell officials that Burr was keeping a briefcase for defendant which he had to bring to him at Lyon's office. Defendant further instructed Burr to tell officials that he waited in the car while defendant met with Lyon. Defendant told Burr to say that he then saw defendant and Lyon in Lyon's truck and that defendant was driving. Finally, defendant instructed Burr to say that he and defendant left Lyon's office around 6:30 p.m. and proceeded to go out for drinks.
A few days after Lyon's body was discovered, Burr was questioned by two police officers about his whereabouts on 31 December 1991. Burr repeated the story that defendant had instructed him to tell. The SBI later called Burr, requesting that he take a polygraph test. Burr responded that he only would take the test if his attorney advised it. After having this conversation, Burr then wrote out a letter concerning the events of 31 December 1991 on a yellow legal pad, which he mailed to himself and directed Hopkins to place into a safety deposit box.
In addition to this information, Burr's letter also included the following statement:
Today is 1-21-92. It is 10:30 a.m. About one and a half hours ago an SBI Agent Greene called to see if I would take a polygraph. I refused. My reason for writing this letter is because I'm scared of the near future. I had nothing to do with the death of Ris Lyon. I have not seen or had any money of Ris Lyon's or Jerry Edgeworth in my possession.
Jerry has offered me nothing for my help. At no time has Jerry admitted anything to me about Ris Lyon's death. Sitting in his car in my front yard, Jerry told me not to ask him any questions because I didn't want to know or need to know anything. He says, "You can't tell what you don't know."
I consider Jerry to be the best friend a man could possibly have. He has done me many, many favors. He had helped me at times and in ways that nobody else would have.
I believe that in the near future one of several things will happen. Ris Lyon's death could be ruled suicide, self-inflicted. It could be that not enough evidence can be collected to bring about charges. It could be that Jerry is charged, and not me. My biggest fear is that I would be arrested and charged with murder. If so, I don't know if I could sit in jail with no bond until a trial. Should the SBI offer me a deal to turn against Jerry, I don't know what I might do. I don't think the SBI or anybody else thinks that I killed Ris Lyon. I do think that they believe I would try to help Jerry  even lie for him.
I can't believe I let anybody put me in the position I'm in. Jerry is far smarter than most people know. He has had plenty of time to think about a plan. I doubt it, but it could be that before it's all over Jerry will try to put the blame on me. I doubt it, but who knows what a desperate person might do.
Since I'm the only person that could put him in Rockingham on the night of Mr. Lyon's death, it is possible that I might come up dead. If Jerry and myself were charged and convicted of murder, would Jerry come forward and tell all so as to help me? And, if he did, would it still be too late for me? Could my sentence be reversed?
This is my story. This is all the truth, and the way I am thinking. To any and all members of the Ris Lyon family and friends, let me say that I'm sorry. Nobody could punish me any more than I've already been punished for my part.
This letter will be placed in a safety deposit box. And that box will not be opened for any reason, except to get this letter and turn it over to the right person. My reason for this letter is for my future protection against Jerry, if needed. And it is my true confession. Ronnie Douglas Burr.
Burr began distancing himself from defendant, and rumors concerning him and defendant and Lyon's death began to spread. Burr then questioned defendant about the night of Lyon's death, and although he never fully admitted to killing Lyon, defendant did provide Burr with additional information concerning his activities on 31 December 1991. Defendant stated that he instructed Burr to tell the police that defendant was driving Lyon's truck so that there would be an explanation if the truck contained his finger prints. Defendant also stated that he placed the gun in Lyon's hand and fired it so that paraffin would be on Lyon's hand for a paraffin test. In addition, defendant also stated that he forced Lyon into the truck and compelled him to drive to Rockingham at gunpoint, which was the reason he called Burr to pick him up. Finally, defendant expressed his relief that it was cold the night of 31 December 1991 and investigators were unable to ascertain an approximate time of death.
On 9 February 2004, defendant was indicted for the 31 December 1991 kidnapping and murder of Lyon. During the course of defendant's first trial, the State attempted to admit testimony concerning defendant's alleged 1983 assault on his ex-wife, Diane Rorie ("Rorie"). The trial court denied the State's motion to admit Rorie's testimony with respect to the 1983 assault. On 20 February 2008, a jury unanimously found defendant not guilty of kidnapping and deadlocked on the murder charge. On 21 February 2008, the trial court declared a mistrial regarding the murder charge, and on 12 May 2008, defendant was re-tried for the murder of Lyon.
During the course of defendant's second murder trial, Katrina Johnson ("Johnson") testified about an experience that she had while working with defendant when he was a manager at the Omelette Shoppe from 1997 until 2001. According to her testimony, one afternoon between 1997 and August 1999, a black man walked behind the building, which angered defendant, and he proceeded to argue with the bystander outside. Johnson testified that, after the argument, defendant came back inside and said, "That God damned nigger. I've already killed one upstanding citizen in Anson County. Who's to say I wouldn't kill a God damned nigger."
The State again sought to admit Rorie's testimony at defendant's second trial, and the trial court conducted a hearing outside the presence of the jury. After considering both sides' arguments, as well as the transcript of Rorie's testimony, the trial court overruled defendant's objection and admitted Rorie's testimony into evidence pursuant to North Carolina Rules of Evidence, Rule 404(b).
The next day, Rorie testified, without objection, that she was married to defendant from 1973 to 1982, after which they divorced. The two experienced great difficulty in reaching an agreement regarding child support. Although defendant insisted he would pay no more than $300.00 per month, the court ordered him to pay approximately $550.00 per month.
Rorie further testified that, shortly after entry of the order, defendant came to her home angry about his child support obligation. He attempted to enter the house, but Rorie's brother previously had changed the locks and had nailed the windows shut. In order to gain entry, defendant went to the window air conditioning unit, shook it until it became disconnected from the house, and forced an opening to gain entry into the home. Defendant then pointed a gun at Rorie's head, stated he would not pay more than $300.00 per month in child support, and threatened to kill her if she did not sign a document stating she agreed to these new terms.
On 23 May 2008, after hearing all of the evidence from both parties, a jury found defendant guilty. The trial court entered its judgment upon the jury's verdict finding defendant guilty of first-degree murder and sentenced defendant to life imprisonment in the custody of the North Carolina Department of Correction. Defendant appeals.
On appeal, defendant contends that the trial court committed plain error by admitting Rorie's testimony pursuant to Rule of Evidence 404(b) in defendant's retrial  testimony which had been excluded from his first trial. We disagree.
North Carolina Rule of Evidence 404(b), provides in relevant part that
[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.
N.C. Gen. Stat. § 8C-1, Rule 404(b) (2007). Our Supreme Court has explained that the rule is
a clear general rule of inclusion of relevant evidence of other crimes, wrongs or acts by a defendant, subject to but one exception requiring its exclusion if its only probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged.
State v. Coffey, 326 N.C. 268, 278-79, 389 S.E.2d 48, 54 (1990) (emphases omitted). "The list of permissible purposes for admission of `other crimes' evidence is not exclusive, and such evidence is admissible as long as it is relevant to any fact or issue other than the defendant's propensity to commit the crime." State v. White, 340 N.C. 264, 284, 457 S.E.2d 841, 852-53 (citing State v. Bagley, 321 N.C. 201, 206, 362 S.E.2d 244, 247 (1987), cert. denied, 485 U.S. 1036, 99 L. Ed. 2d 912 (1988)), cert. denied, 516 U.S. 994, 133 L. Ed. 2d 436 (1995).
However, relevant evidence that has been determined to be admissible pursuant to Rule 404(b) still may be subject to exclusion pursuant to North Carolina Rules of Evidence, Rule 403. The court, in its discretion, must determine "if . . . [the] probative value [of the proffered evidence] is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.C. Gen. Stat. § 8C-1, Rule 403 (2007). See State v. Summers, 177 N.C. App. 691, 697, 629 S.E.2d 902, 907 (2006) ("`Once the trial court determines evidence is properly admissible under Rule 404(b), it must still determine if the probative value of the evidence is substantially outweighed by the danger of unfair prejudice' under Rule 403.") (quoting State v. Bidgood, 144 N.C. App. 267, 272, 550 S.E.2d 198, 202, cert. denied, 354 N.C. 222, 554 S.E.2d 647 (2001)).
However, in the case sub judice, because defendant failed to object to Rorie's testimony, he concedes that he is entitled to appellate review only for plain error. See N.C. R. App. P. 10(c)(4) (2007). See also State v. Grooms, 353 N.C. 50, 65-66, 540 S.E.2d 713, 723 (2000), cert. denied, 534 U.S. 838, 151 L. Ed. 2d 54 (2001) ("We have previously stated that a motion in limine is not sufficient to preserve for appeal the question of admissibility of evidence if the defendant does not object to that evidence at the time it is offered at trial. We have also held that a pretrial motion to suppress, a type of motion in limine, is not sufficient to preserve for appeal the issue of admissibility of evidence.") (citations omitted).
[T]he plain error rule . . . is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a fundamental error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done, or where [the error] is grave error which amounts to a denial of a fundamental right of the accused, or the error has resulted in a miscarriage of justice or in the denial to appellant of a fair trial or where the error is such as to seriously affect the fairness, integrity or public reputation of judicial proceedings or where it can be fairly said the instructional mistake had a probable impact on the jury's finding that the defendant was guilty.
State v. Odom, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (brackets in original) (internal quotation marks omitted) (quoting United States v. McCaskill, 676 F.2d 995, 1002 (4th Cir.) (emphasis in original) (second brackets in original) (footnote call numbers omitted), cert. denied, 459 U.S. 1018, 74 L. Ed. 2d 513 (1982)). "[T]he appellate court must be convinced that absent the error the jury probably would have reached a different verdict. In other words, the appellate court must determine that the error in question `tilted the scales' and caused the jury to reach its verdict convicting the defendant." State v. Walker, 316 N.C. 33, 39, 340 S.E.2d 80, 83 (1986) (citation omitted). "In meeting the heavy burden of plain error analysis, a defendant must convince this Court, with support from the record, that the claimed error is so fundamental, so basic, so prejudicial, or so lacking in its elements that absent the error the jury probably would have reached a different verdict." State v. Cummings, 352 N.C. 600, 636, 536 S.E.2d 36, 61 (citations omitted).
In the case sub judice, during defendant's second trial for Lyon's murder, Rorie was permitted to testify that defendant previously had forced his way into her home by removing an air-conditioning unit in a window and that he then forced her, at gunpoint, to sign a document agreeing to lower his child support obligation. The trial court allowed Rorie's testimony pursuant to Rule 404(b) for the permissible purposes of showing motive, intent, or that Lyon's death was not a suicide.
After careful review, we hold that the trial court did not commit plain error in the case sub judice by admitting Rorie's testimony. Although the jury deadlocked in defendant's first trial and was able to reach a guilty verdict in his second trial, defendant fails to meet his "heavy burden" to demonstrate sufficient prejudice to show plain error based upon the record before this Court. Cummings, 352 N.C. at 636, 536 S.E.2d at 61. Because defendant fails to demonstrate sufficient prejudice, we need not address whether the trial court erred by admitting Rorie's testimony in defendant's second trial.
The record does not reveal whether Rorie's testimony was the only new or different evidence admitted in the second trial. Notwithstanding, the record does disclose that the jury in defendant's second trial received, inter alia, (1) Johnson's testimony disclosing defendant's admission after Lyon's death that defendant "already killed one upstanding citizen in Anson County[;]" (2) Burr's letter discussing defendant's timeline for planning Lyon's death as well as defendant's urging Burr not to ask any questions about Lyon's death because, "You can't tell what you don't know[;]" (3) Burr's testimony detailing the instructions defendant provided Burr to pick up defendant near Lyon's office on the night of Lyon's death and to offer corroborative explanations to investigators, as well as testimony regarding defendant's statements that it was "a sloppy job," that he "left his foot on the brake," that defendant was relieved that investigators could not determine an approximate time of death, and that defendant displayed an anxious demeanor and request for Burr's help that went "way beyond friendship"; (4) Burr's assistance in disposing of defendant's bloody jacket, shirt, and phone; (5) defendant's wife's testimony that defendant had on different clothes at 9:00 p.m. on the night of Lyon's death and that she never saw that jacket or shirt again; and (6) the wealth of evidence regarding defendant's financial motive to remove a debt and, as the State suggests, "implausible" secretive financial dealings, such as defendant's allegedly paying Lyon $100,000.00 in cash without a receipt or any mention of the transaction by Lyon to anyone. Therefore, in view of this evidence and without a stronger showing of prejudice from defendant with respect to the purported error, we cannot say that defendant was prejudiced such that a jury would have reached a different result but for Rorie's testimony. See Walker, 316 N.C. at 39, 340 S.E.2d at 83; Odom, 307 N.C. at 660, 300 S.E.2d at 378.
Accordingly, we hold that defendant failed to demonstrate that the trial court committed plain error by admitting Rorie's testimony.
No Prejudicial Error.
Chief Judge MARTIN and Judge STROUD concur.
Report per Rule 30(e).