STEPHENS, Judge.
Defendant Roger Lewis Smyre was convicted in Iredell County Superior Court on one count of felony operating a motor vehicle to elude arrest, one count of resisting a public officer, and one count of displaying a false or fictitious registration plate. Smyre appeals from the trial court's denial of his motion to suppress evidence from a photographic lineup that he contends was impermissibly suggestive in violation of his constitutional due process rights, as well as any in-court identifications related to that lineup. Smyre also argues that the photographic lineup violated North Carolina's Eyewitness Identification Reform Act ("EIRA"), codified at section 15A-284.50 et seq.of our General Statutes, and that the trial court compounded its error in denying his motion to suppress by failing to adequately support its conclusions of law with sufficient findings of fact. However, because Smyre did not object when the evidence he sought to suppress was introduced at trial, and has failed to sufficiently allege plain error on appeal, we conclude these issues are not properly before this Court. Consequently, we dismiss this appeal.
I. Factual Background and Procedural History
On 25 December 2012, Edna Latia King met a man who went by the name of "Red" at her cousin's house in Taylorsville. According to the statement she subsequently gave to officers from the Statesville Police Department ("SPD"), King initially "thought it was Red from Taylorsville, but [her cousin] said it was Red from Statesville ." King described Red as "an older guy with short ugly dreads, kind of like twisties" who "really didn't say much but winked at me a few times." King and Red smoked a blunt[1] together, and Red told her that "his daughter could do my hair and that her name was Daphne Smyre." After a few hours of socializing, Red gave King his phone number.
On 28 December 2012, King and Red exchanged text messages and arranged for Red to pick up King at her mother's house in Taylorsville so they could "hang out" together in Statesville. When Red arrived at her mother's house driving a gray Nissan Maxima, King helped him remove the license plate from her mother's car and put it on his vehicle. The two then drove to King's house on Scott's Creek in Statesville, where they watched a movie and smoked a blunt. Red also gave King a pill to take, and at one point attempted to become romantic with her, but King rejected his advances. After several hours, Red offered to drive King back to her mother's house in Taylorsville. On the way there, they stopped first at an apartment complex located near Knox Avenue in Statesville. Red got out of the vehicle, told King to wait, and then went inside an apartment for a few minutes. When Red returned to the vehicle, he and King both noticed a gray Jeep Cherokee idling nearby, which prompted Red to remark, "[t]hat looks like the jump out boys."[2] At that time, King did not understand that Red was referring to the SPD's Street Crimes Unit, but Red's suspicions soon proved well founded.
Captain David Onley of the SPD's Street Crimes Unit was behind the wheel of the unmarked police Jeep that King and Red noticed outside the Knox Avenue apartment complex. That night, Captain Onley was attempting to locate three individuals who were suspected in a string of burglaries, and was accompanied in his Jeep by two other SPD officers, as well as two additional officers in an unmarked Ford Focus. There had been no sign of the burglary suspects, but Captain Onley grew suspicious when he saw a man exit an apartment and then immediately stop after spotting the unmarked police Jeep while walking on the sidewalk toward the Maxima. Due to the poor lighting, Captain Onley was unable to determine the race, height, or build of the man who eventually got into the Maxima, but he did notice that the man was wearing brown overalls, a brown jacket, and a black toboggan.
Upon returning to the Maxima, Red drove out of the apartment complex at a normal speed and turned onto Williams Road, but then started driving faster when the Jeep began to follow. Although the posted speed limit on Williams Road is 35 miles per hour, the Maxima sped down it at a rate the officers in the Jeep estimated was in excess of 60 miles per hour. King later stated that she became scared by how fast Red was driving and estimated that his speed was "about 100 miles per hour." At one point, the Maxima drifted to the left side of the road, causing an oncoming vehicle to swerve off into the dirt in order to avoid a collision.
When the Maxima reached Rita Avenue, where the posted speed limit is 25 miles per hour, the officers in the Jeep activated its siren and blue lights. Red slowed down to take a curve, then quickly accelerated onto Kennedy Drive, which is a dead-end road with no posted speed limit, at a rate of between 60 and 70 miles per hour. At the end of the road, Red drove the Maxima across the yard of a residence, came to a stop, jumped out of the vehicle, told King "[y]ou don't know me," and then ran away into the surrounding woods.
Captain Onley's unmarked police Jeep was a short distance behind the Maxima at the end of Kennedy Drive when he saw the driver exit the vehicle and run toward the woods. Captain Onley later testified that he could see the outer edge of the driver's face as he passed through the vehicles' headlights, and was thus able to determine that the person fleeing was African American, male, and approximately six feet tall. Onley and another officer got out of their vehicle and followed the driver into the woods but were unable to locate him. A K-9 officer called to the scene was equally unsuccessful. Meanwhile, Officer Richard Dillard remained at the Maxima with King and began to question her about the driver's identity. King initially told him that she did not know the driver's name or anything else about him. However, after Dillard ran a check on the Maxima's license plate and discovered that it was registered to a vehicle belonging to King's mother, King provided a statement in which she explained that the driver was from Statesville, that his nickname was "Red," that he told her his daughter was named Daphne Smyre, and that he was "an older guy with short ugly dreads" around six-feet, two-inches tall with a slim build wearing "dark brown overalls, a black hat, brown jacket and long johns."
Based on King's statement, Captain Onley and the other officers concluded that the Maxima's driver was Richard Lewis Smyre. The next day, on 29 December 2012, Officer Dillard applied for a warrant for Smyre's arrest. Captain Onley later testified that although the VIN check he ran on the Maxima revealed that its owner was a man named Gregory Wayne Bowman, he believed that Smyre was the driver even before hearing King's statement. Onley explained that he knew Smyre-and the fact that he went by the nickname "Red"-through his work in the SPD narcotics division and that he was sufficiently familiar with Smyre's height, build, and habit of wearing the "exact same outfit" of brown overalls and jacket to have immediately suspected Smyre was the driver based on having seen the side of his face as he ran past the headlights into the woods.
On 27 March 2013, pursuant to a request from the district attorney's office, Officer Dillard and SPD Investigator Kelly Wilson went to King's house and presented her with a photographic lineup. The lineup contained eight photographs of African American males. The first seven photographs were printed vertically and were fillers that depicted men who were not suspects. The eighth photograph, which was printed horizontally, was a photograph of Smyre. All eight of the men pictured were approximately the same age. One of the men depicted was bald, while the other seven-including Smyre-each had black hair cut relatively short; all eight had similar facial hair. Wilson showed the photographs to King one by one after reading her the SPD's photographic lineup presentation guidelines, which mirror the instructions required by section 15A-284.52(b)(3) of our General Statutes. King said "no" when asked whether or not each of the first seven photographs depicted the man who drove the Maxima on 28 December 2012. When she saw the photograph of Smyre, King stated, "That's him, I'm sure."
On 13 May 2013, an Iredell County grand jury indicted Smyre on one count of felony speeding to elude arrest, one count of resisting a public officer, and one count of displaying a fictitious or altered vehicle registration plate. On 10 December 2013, a jury trial began in Iredell County Superior Court. Smyre's trial counsel filed a motion in limineto suppress King's photographic lineup identification, as well as any related in-court testimony from King identifying Smyre as the man who drove the Maxima. In support of this motion, Smyre's counsel argued that the photographic lineup was impermissibly suggestive in violation of both the EIRA and Smyre's constitutional right to due process because (1) the photograph of Smyre unduly stood out given that it was printed horizontally while the other seven filler photographs were printed vertically; (2) the photographs did not resemble King's description of the driver; and (3) the photograph of Smyre was allegedly 20 years out of date instead of contemporaneous with the events at issue.
During the voir direhearing that followed, Officer Dillard testified that he prepared the photographic lineup using a picture of Smyre he obtained from the Department of Correction's ("DOC") website; that he did not know how old the DOC photograph of Smyre was and did not remember there being any other photographs of him available through DOC's website; that the seven filler photographs were chosen because the men they depicted shared similar characteristics with the DOC photograph of Smyre; and that he had no control over how the photographs appeared or whether they were printed vertically or horizontally because he merely "clicked on them and printed the individual pages. That's all I did. I can't control the layout of the picture. I just look at the person." Officer Dillard testified further that it was Investigator Wilson who conducted the lineup with King while he stood at a distance in order to avoid any potential risk of influencing King's identification. When pressed on cross-examination as to why neither the DOC photograph of Smyre nor the seven filler photographs precisely matched the description King gave in her 28 December 2012 statement, Officer Dillard explained that his options were limited because there were no photographs available on DOC's website featuring Smyre clean-shaven or with short dreadlocks. As Dillard elaborated:
Well, starting with Mr. Smyre's picture, he's got facial hair in this picture. So I can't go and select seven people without facial hair. So based on this picture which as I sit here, I would think I would have chosen the most recent picture if there were a variety of pictures. Most recent being most relevant. So I have to, you know, turn back to this one. And not the exact description of what [King] gave. If there was a picture in DOC of Mr. Smyre with short [dreadlocks], of course I would have selected that one, you know. I mean it went and chose seven other people that had short twistee d[r]eadlocks. So the objective was to match this picture, not match her exact description.
Investigator Wilson also testified during the voir direhearing. He explained that although he had heard that SPD officers were involved in a car chase on 28 December 2012, he otherwise had no prior involvement in or knowledge of the case until he conducted the photographic lineup on 27 March 2013, and that Officer Dillard did not tell him who the target of the lineup was or discuss anything else about the case with him beforehand. Wilson testified further that, apart from introducing him to King, Officer Dillard was not involved in conducting the lineup. Wilson also explained that before showing King any of the photographs, he instructed her that
the suspect may or may not be presented in this lineup. The officer presenting this lineup does not know the suspect's identity. You should not feel pressured or compelled to make an identification. It is just as important to exclude innocent persons as it is to identify the suspect. And this investigation will continue whether or not you make an identification from this lineup.
Wilson confirmed that when King was shown the photograph of Smyre she said, "That's him, I'm sure," and then signed and dated the back of the photograph to indicate that it depicted the man who drove the Maxima on 28 December 2012.
At the close of the voir direhearing, the trial court denied Smyre's motion to suppress. In response to Smyre's argument that the use of a photograph that he alleged was 20 years old and did not precisely match King's description violated the EIRA, the trial court found that the lineup substantially complied with section 15A-252(b)(4)'s requirement that photographs of suspects "shall be contemporary and to the extent practicable, shall resemble the suspect's appearance," noting further that "[h]ad I been the DA in this matter, I would have made an argument that because the photograph doesn't show the dreads as Miss King had [described], that the picture shows that Mr. Smyre is somewhat younger, that that goes to [Smyre's] benefit in this matter." The trial court also rejected Smyre's argument that the lineup violated his constitutional right to due process because the contrast between his vertically printed photograph and the horizontally printed filler photographs was impermissibly suggestive. While conceding that the difference "is a little bit off," the court explained that although it initially found Smyre's allegations troubling, "now that I actually see the photographs in this matter, there is not-that is not unduly suggestive." The court also denied Smyre's motion to prohibit King from making an in-court identification, emphasizing the fact that
[King] had plenty of time and was with Mr. Smyre for a significant period of time before the chase. They sat and watched a movie together and [she] was in the car with Mr. Smyre as well when this was going on and met Mr. Smyre before then. So there is ample opportunity for Miss King in this matter to have an independent recollection of who Mr. Smyre was-is and could identify him in court if she can do so.
King was the first witness to testify during the trial that followed, and her testimony largely mirrored the account she gave to Officer Dillard in her 28 December 2012 statement, which was also read into evidence. At several points during her testimony, King identified Smyre as the man who drove the Maxima, and Smyre made no objection to these in-court identifications, or to King's testimony about the 27 March 2013 photographic lineup, or to subsequent testimony from Officer Dillard and Investigator Wilson about their respective involvement in compiling and conducting the lineup. On cross-examination, Smyre's trial counsel sought to impeach King's credibility by highlighting the facts that she had only met the man whom she knew as "Red" on two occasions, that she had admitted to taking drugs on both those occasions, that she knew at least one other man named "Red," and that the picture of "Red" she saw during the photographic lineup did not precisely match the description she gave of him in her 28 December 2012 statement. When Smyre's counsel attempted to capitalize on the fact that King had testified on direct examination that despite having understood Investigator Wilson's instructions before the photographic lineup, she felt "compelled" to make an identification, King replied, "I mean they-like that night [on 28 December 2012] they told me they knew who it was, like they already knew. So regardless if I played my part or not, they knew. So I mean why would I lie? If they know that I know...." On redirect, King clarified that she knew that the "Red" who drove the Maxima that night was Smyre, and that although he appeared to be younger with shorter hair in the photograph she saw during the 27 March 2013 lineup, King remained certain he was the same man she met in December 2012.
Smyre did not put on any evidence, but throughout the trial, his counsel emphasized King's intoxication to attack the credibility of her identification, as well as minor inconsistencies between her testimony and her 28 December 2012 statement. Smyre's counsel also insisted that by crediting King's statement instead of interviewing the Maxima's registered owner Gregory Wayne Bowman, the SPD officers failed to conduct a thorough investigation. Before the jury retired to deliberate, the trial court instructed it in accordance with subsection (d)(3) of the EIRA that
[e]vidence has been presented concerning compliance or non-compliance with the requirements for administrative-administration of a photo lineup to an eyewitness. You may consider what evidence you find to be credible concerning compliance or non-compliance with such requirements in determining the reliability of eyewitness identification.
On 12 December 2013, the jury returned verdicts finding Smyre guilty on all three charges. That same day, Smyre admitted to two aggravating factors regarding the felony fleeing to elude arrest conviction and, after consolidating Smyre's convictions, the trial court sentenced him to a term of 10 to 21 months imprisonment. Smyre gave notice of appeal in open court.
II. Analysis
Smyre argues that the trial court erred in denying his motion to suppress the photographic lineup and King's subsequent in-court identification. Although Smyre filed a motion in limineto suppress this evidence, our Supreme Court's prior holdings make clear that such a motion "is not sufficient to preserve for appeal the question of admissibility of evidence if the defendant does not object to that evidence at the time it is offered at trial." State v. Grooms,353 N.C. 50, 65, 540 S.E.2d 713, 723 (2000) (citation omitted), cert. denied,534 U.S. 838, 151 L.Ed.2d 54 (2001). Thus, because Smyre failed to timely object when this evidence was introduced at trial, our review is limited to plain error. SeeN.C.R.App. P. 10(a)(4) (providing that an issue that was not properly preserved for appellate review "may be made the basis of an issue presented on appeal when the judicial action questioned is specifically and distinctly contended to amount to plain error.") (emphasis added). To prevail under our plain error standard of review, "a defendant must establish prejudice [such] that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty." State v. Lawrence,365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012) (citations and internal quotation marks omitted). In other words, the defendant must prove that "absent the error, the jury probably would have returned a different verdict." Id.at 519, 723 S.E.2d at 335. However, where an appellant fails to specifically and distinctly allege plain error in his brief, his argument "is not properly before this Court." Grooms,353 N.C. at 66, 540 S.E.2d at 723.
In the present case, instead of specifically and distinctly alleging plain error, Smyre presented this Court with a 22-page brief that focuses far less attention on our standards of review than on how the facts of this case resemble a scene from the film Casablancawherein Captain Louis Renault instructs his men to "round up the usual suspects." The brief then attempts to draw an analogy between (a) this famous fictional character's habit of arresting innocent men as suspects for crimes there was no evidence they had committed, and (b) Smyre's trial counsel's argument that the SPD failed to conduct a thorough investigation before designating Smyre as a suspect. We find this reliance on a memorable cinematic circumstance inapposite to the present facts and entirely misplaced.
Here, Smyre's brief fails to specifically and distinctly argue plain error. Smyre does list plain error as one among multiple potential standards of review, stating under the Standards of Review section of his brief that: "[t]he admission of [Smyre's] identification also maybe reviewed for plain error [,]" (citation omitted, emphasis added), and that "[p]lain error is a fundamental error that had a probable impact on the jury's verdict." (citation omitted). The remainder of his brief, however, offers no specific and distinct argument as to how or why the trial court's denial of his motion to suppress amounted to plain error. Indeed, the majority of Smyre's arguments are presented as though the issues had been properly preserved for our review, and the only other time that the term "plain error" appears in his brief is a fleeting statement that "Mr. Smyre specifically and distinctly contended the judicial actions questioned in [his] proposed issues on appeal amounted to plain error. N.C.R.App. P. 10(a)(4). This issue is properly before this Court." This statement is merely a reference to the listing of Smyre's Proposed Issues on Appeal in the record on appeal.
However, our Supreme Court made clear in Groomsthat merely including plain error as an alternative in a laundry list of proposed issues on appeal is insufficient to invoke review under Rule 10 if the defendant fails to specifically argue plain error in his brief. See Grooms,353 N.C. at 66, 540 S.E.2d at 723 ("Additionally, while [the] defendant's assignment of error includes plain error as an alternative, he does not specifically argue in his brief that there is plain error in the instant case."). Likewise here, we conclude that Smyre's conclusory assertion regarding his proposed issues on appeal coupled with a citation to our Rules does not constitute compliance with the requirement that an appellant "specifically and distinctly" allege plain error. Consequently, Smyre's argument is not properly before this Court.
In any event, we note that even if Smyre had properly argued plain error, our prior decision in State v. Wilson,--- N.C.App. ----, 737 S.E.2d 186, disc. review denied,366 N.C. 592, 743 S.E.2d 191 (2013) demonstrates that the trial court neither erred nor committed plain error in denying his motion to suppress. In Wilson,we rejected a defendant's argument that the trial court erred in failing to suppress evidence from a photographic lineup he alleged was impermissibly suggestive because his photograph, which he alleged did not resemble him at the time of the offense, was smaller than the filler photographs, which he also alleged did not precisely resemble the eyewitness's description of him. See id.at ___, 737 S.E.2d at 188. In addressing the defendant's arguments regarding "[t]he failure to ensure that the photograph resembled [him] and that the other photographs resembled the witness's description," we held that the trial court complied with the EIRA by providing the statutorily required remedial instruction for the jury that it "may consider what evidence [it] find[s] to be credible concerning compliance or non-compliance with [the EIRA's] requirements in determining the reliability of eyewitness identification." Id.Moreover, we explained that the test for determining whether a photographic lineup is impermissibly suggestive in violation of a defendant's constitutional due process rights is "whether the totality of the circumstances reveals a pretrial procedure so unnecessarily suggestive and conducive to irreparable mistaken identity as to offend fundamental standards of decency and justice." Id.(citation and internal quotation marks omitted). After noting our Supreme Court's emphasis on "pertinent aspects of the array, such as similarity of appearance of those in the array and any attribute of the array tending to focus the witness' attention on any particular person therein," we held-based on the trial court's factual findings that the filler photographs matched the defendant's race, age, hair style, height, weight and facial expressions, and the absence of any North Carolina authority that an identification "based on a smaller photograph ... result[s] in substantial and irreparable prejudice"-that the size discrepancy "was not impermissibly suggestive." Id.(citation and internal quotation marks omitted).
Similarly here, Smyre cites no North Carolina authority to support his assertion that the photographic lineup's horizontal/vertical disparity was impermissibly suggestive, and we share the trial court's conclusion that although Smyre's allegations are troubling to read, when viewed in its full context, the photographic lineup does not appear unduly suggestive, especially in light of the ample opportunity King had to observe Smyre and form an independent recollection of him before the 28 December 2012 chase. Smyre also contends that the lineup violated the EIRA because the photograph of him was not contemporary, given his allegation that it was 20 years out of date, and neither it nor the fillers precisely matched King's description. However, this argument also fails. On the one hand, apart from a passing remark from Smyre's trial counsel, no evidence was introduced as to the age of the photograph, and we note further that subsection (b) of the EIRA only requires that "the photograph of the suspect shall be contemporary and, to the extent practicable, shall resemble the suspect's appearance at the time of the offense." N.C. Gen.Stat. § 15A-284.52(b)(4) (2013) (emphasis added). Our review of the record demonstrates that Officer Dillard substantially complied with this requirement by selecting the most recent photograph available from the DOC's website. Moreover, we conclude that by selecting filler photos that matched the available photograph of Smyre, rather than precisely mirroring King's description, Officer Dillard substantially complied with the EIRA's requirements that "[t]he lineup shall be composed so that the fillers generally resemble the eyewitness's description of the perpetrator, while ensuring that the suspect does not unduly stand out from the fillers," id.§ 15A-284.52(b)(5) (emphasis added), and that "[a]ll fillers selected shall resemble, as much as practicable,the eyewitness's description of the perpetrator in significant features, including any unique or unusual features." Id.§ 15A-284.52(b)(5)(a) (emphasis added). We also note that here, as in Wilson,the trial court provided the statutorily mandated remedial instruction to the jury that it "may consider what evidence [it] find[s] to be credible concerning compliance or noncompliance with [the EIRA's] requirements in determining the reliability of eyewitness identification." See--- N.C.App. at ----, 737 S.E.2d at 188 ; see alsoN.C. Gen.Stat. § 15A-284.52(d)(3) (2013).
Smyre's only remaining argument-that the trial court erred by failing to make adequate findings of fact and conclusions of law to support its decision to deny his motion to suppress-is fatally undermined by our review of the record, which clearly demonstrates that the court held a full evidentiary hearing on Smyre's motion and responded with specific factual findings and legal conclusions to amply address each of the arguments he raised below. Although the trial court may not have precisely answered or anticipated every single aspect of Smyre's argument on appeal, we know of no authority in our State that imposes such a duty. Accordingly, this appeal is
DISMISSED.
Judges HUNTER, JR., and TYSON concur.
Report per Rule 30(e).
Opinion
Appeal by Defendant from judgment entered 12 December 2013 by Judge Christopher W. Bragg in Iredell County Superior Court. Heard in the Court of Appeals 18 March 2015.

As the prosecutor explained at trial, "[a] blunt has tobacco but it's also mixed with marijuana[.]"

At trial, SPD Captain David Onley explained that the nickname "jump out boys" originated several years ago as a description of how police drug units across the United States operate, whereby three or four officers ride in the same unmarked vehicle to observe suspected drug deals and then "jump out" on the suspects.